```
 1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2                         WESTERN SECTION

 3

 4   MARGARET CAHILLANE,                )
                           Plaintiff,   )
 5                                      )
     vs.                                )   No. 3:22-CV-30156-MGM
 6                                      )
     UNITED STATES OF AMERICA,          )
 7                         Defendant.   )

 8

 9

10          Before the Honorable Mark G. Mastroianni
                United States District Court Judge
11

12       Bench Trial Day 4 held in Hampden Courtroom

13

14                  Wednesday, June 4, 2025
                         9:30 a.m.
15

16

17

18

19

20                              United States Courthouse
21                              Hampden Courtroom, Third Floor
                                300 State Street
22                              Springfield, Massachusetts 01105

23

24               Leigh B. Gershowitz, RMR, CRR
                 Official Federal Court Reporter
25                    Leighjoeem@gmail.com
```

APPEARANCES:

On Behalf of the Plaintiff:

        ALEKMAN DiTUSA, LLC
        By:  Laura D. Mangini
        1550 Main Street, Suite 401
        Springfield, Massachusetts 01103
        413-781-0000
        laura@alekmanditusa.com

        ALEKMAN DiTUSA, LLC
        By:  Joseph Ristau
        1550 Main Street
        Springfield, Massachusetts 01103
        413-781-0000
        joseph@alekmanditusa.com

        ALEKMAN DiTUSA, LLC
        By:  Hayley M. Sartori
        1550 Main Street, Suite 401
        Springfield, Massachusetts 01103
        413-781-0000
        hayley@alekmanditusa.com

On Behalf of the Defendant:

        UNITED STATES ATTORNEY'S OFFICE
        By:  Christopher L. Morgan
        300 State Street, Suite 230
        Springfield, Massachusetts 01105
        413-785-0269
        christopher.morgan2@usdoj.gov

        UNITED STATES ATTORNEY'S OFFICE
        By:  Eve A. Piemonte
        John Joseph Moakley U.S. Courthouse
        One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
        617-748-3369
        eva.piemonte@usdoj.gov


ALSO PRESENT:

        Pauline Pytko, U.S. Attorney's Office

1                          I N D E X

2

3

WITNESS                                                    PAGE

4

**SPECIAL AGENT CASEY ANDERSON**

5

DIRECT EXAMINATION BY ATTORNEY PIEMONTE               16
6    CROSS-EXAMINATION BY ATTORNEY MANGINI                22
     REDIRECT EXAMINATION BY ATTORNEY PIEMONTE            25
7    RECROSS-EXAMINATION BY ATTORNEY MANGINI              26
     **EDWARD MICHNA, M.D.**

8

DIRECT EXAMINATION BY ATTORNEY PIEMONTE               27
9    CROSS-EXAMINATION BY ATTORNEY MANGINI                64
     REDIRECT EXAMINATION BY ATTORNEY PIEMONTE           145
10   RECROSS-EXAMINATION BY ATTORNEY MANGINI             163
     FURTHER REDIRECT EXAMINATION BY ATTORNEY PIEMONTE   170
11   FURTHER RECROSS-EXAMINATION BY ATTORNEY MANGINI     171
     FURTHER REDIRECT EXAMINATION BY ATTORNEY PIEMONTE   172

12

13

14

15                       E X H I B I T S

16   NO.                    DESCRIPTION                   PAGE

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2            (Bench Trial Day 4 commenced at 9:46 a.m.)

 3            THE CLERK:  Your Honor, the matter before the Court

 4   is Civil Case 22-30156, Cahillane vs. United States of

 5   America.

 6            Counsel, can you please identify yourself for the

 7   record, starting with the plaintiff.

 8            ATTORNEY MANGINI:  Good morning, your Honor.

 9   Attorney Laura Mangini for the plaintiff, Margaret Cahillane.

10            ATTORNEY RISTAU:  Good morning, your Honor.

11   Attorney Joseph Ristau for the plaintiff.

12            ATTORNEY SARTORI:  Good morning, your Honor.

13   Attorney Hayley Sartori for the plaintiff.

14            THE COURT:  Okay.

15            ATTORNEY MORGAN:  Good morning, your Honor.

16   Christopher Morgan on behalf of the United States.

17            ATTORNEY PIEMONTE:  Good morning, your Honor.  Eve

18   Piemonte on behalf of the United States.  And with us at

19   counsel table is Ms. Pauline Pytko.

20            THE COURT:  All right.  Very good.

21            Good morning, everyone.

22            All right.  Attorney Morgan.

23            ATTORNEY MORGAN:  Your Honor, before we -- the

24   Government calls its first witness, since the plaintiff has

25   rested, the Government is going to move, pursuant to
```

1    Rule 52(c), for a judgment based on partial findings.

2              THE COURT:  Okay.

3              ATTORNEY MORGAN:  The plaintiff has been fully heard

4    on the question of negligence, and they failed to meet their

5    burden of establishing that the United States was, in fact,

6    negligent in this case.

7              As the Government noted at the outset of this case,

8    the mere occurrence of an accident is not -- does not mean

9    that an action was negligent.  That's effectively the

10   defendant's -- the plaintiff's entire case here, your Honor.

11             They contend that Special Agent Karangekis was

12   negligent because the plaintiff was ahead of him on South

13   Street; he looked away from the road for a moment; and an

14   accident occurred.  That, in a nutshell, is what the

15   plaintiff's case is here -- that Special Agent Karangekis

16   failed to pay sufficient attention to the road and an

17   accident resulted, and, therefore, they posit that the United

18   States is negligent.

19             But the plaintiff's position is inconsistent with

20   the law of Massachusetts.  The state of negligence is well

21   tried and, I think, well known to this Court, so I'll only

22   cover it very briefly, your Honor.

23             But to prevail on a claim of negligence under

24   Massachusetts law, the plaintiff must show the defendant owed

25   a duty of reasonable care; breached that duty; the plaintiff

1    was injured; and the defendant's breach caused the injury.

2            And the plaintiff has failed to establish that

3    Special Agent Karangekis didn't exercise reasonable care or

4    that he was either the cause-in-fact or the proximate cause

5    of the accident itself.

6            So, first, to the duty of exercise of reasonable

7    care:  Reasonable care is the degree of care that an

8    ordinarily prudent person would exercise under the

9    circumstances.  And so, as I noted, the claim here is that

10   Special Agent Karangekis failed to exercise the duty of care

11   because he looked away from the road for a moment.

12           In effect, that means that the plaintiff's argument

13   is that any time that an individual looks away from the road,

14   they are breaching a duty to the other vehicles on the road.

15   But the plaintiff fails to offer adequate evidence to

16   establish that Special Agent Karangekis failed to act as a

17   reasonable, prudent person.

18           Special Agent Karangekis looked away from the road

19   with a clear road ahead of him.  There's no dispute of that

20   fact.  He crossed South Street on Suffield Street.  He

21   testified the road ahead of him was clear.  The plaintiff's

22   own testimony was that as she drove down Suffield Street, she

23   couldn't see any cars behind her.  She didn't see any cars

24   behind her prior to the collision.

25           As a result, when Special Agent Karangekis looked

1    away from the road for an instant to adjust his heat, as a

2    reasonable person does when they're operating a motor

3    vehicle, when he picked up a handkerchief, he acted as a

4    reasonably prudent person under the circumstances -- a person

5    driving down a clear road with no cars ahead of him and no

6    cars coming in the opposite direction.

7            Therefore, the plaintiff has failed to meet their

8    burden to establish a breach of a duty.

9            As to causation, the defendant can't establish that

10   Special Agent Karangekis was either the cause-in-fact or the

11   proximate cause of the accident in this case.  As for the

12   cause-in-fact, for the but-for cause, the defendant is the

13   factual cause of the harm, where the accident would not have

14   occurred but for the defendant's negligent conduct.  This

15   long-standing principle is essentially to say that a

16   defendant is only responsible when they actually cause the

17   harm.

18           The plaintiff hasn't ever offered evidence

19   sufficient to establish that Special Agent Karangekis's

20   looking away from the road did, in fact, cause the accident.

21   The plaintiff has not offered evidence to establish where

22   Special Agent Karangekis's vehicle was at the moment he

23   looked away from the road or that, if he had not looked away

24   from the road to adjust his heat, the accident would not have

25   occurred.

1      In fact, the plaintiff's own testimony that Special

2  Agent Karangekis's vehicle was never visible behind her

3  before the collision.  Absent is showing that his actual

4  looking away from the road caused the accident.  There's no

5  evidence; the Government can't be held liable because they

6  can't establish a but-for cause in this case.

7      As for the proximate cause, your Honor, the

8  proximate cause of injury is whether the injury was a

9  foreseeable result of the defendant's allegedly negligent

10  conduct.  And when we talk about proximate cause, we talk

11  about that one is obligated to anticipate and provide against

12  what usually happens.  One is not bound to guard against what

13  is only remotely or slightly probable.  So basically,

14  proximate cause relies on considerations of policy and

15  pragmatic judgment.

16      As to the legal cause or the proximate cause of this

17  accident, the question is whether the accident was the

18  foreseeable result of Special Agent Karangekis's actions.

19  But, again, the plaintiff has failed to introduce evidence to

20  meet the burden.

21      One is bound -- as Massachusetts courts have said,

22  one is bound to anticipate and provide against what usually

23  happens, what is likely to happen, but not against what is

24  only remotely or slightly probable.

25      Again, as I said, your Honor, as Special Agent

1    Karangekis drove down Suffield Street, the road was clear

2    ahead of him.  It is undisputed.  He couldn't see any

3    vehicles ahead of him.  The plaintiff couldn't see any

4    vehicles behind her.  There's no basis for the Court to find

5    that Special Agent Karangekis should have anticipated coming

6    across a car stopped in the road that was not visible to him

7    until the last instance.

8         A vehicle stopped in the road is not what usually

9    happens when one is operating their vehicle on a public road.

10   In other words, the possibility -- the possibility the car

11   would be stopped in the road at some point ahead of Special

12   Agent Karangekis is, at best, remotely and slightly probable.

13   And, therefore, it is insufficient to establish that Special

14   Agent Karangekis's looking away from the road momentarily

15   was, in fact, the proximate cause of the injury; and

16   therefore, the Government is entitled to judgment in its

17   favor.

18        Moreover, even if the Government was found -- if the

19   Court determined the Government was partially responsible,

20   the evidence has shown that the plaintiff herself bears some

21   of the burden here.  She stopped in the road.  That's the

22   cause -- that's the act that caused this accident.  Even if

23   Special Agent Karangekis looking away for a moment were found

24   to be negligent, her stopping in the road and remaining there

25   long enough that he could come down that empty road and come

1    upon her stopped in that road was, in fact, the primary cause

2    of this accident, and she would be more than 50 percent

3    responsible in this case.  And, therefore, judgment should be

4    entered for the United States.

5            Thank you, your Honor.

6            THE COURT:  All right.  Did you want to be heard?

7            ATTORNEY MANGINI:  Just briefly, your Honor.

8            In terms of the comparative negligence -- I'll just

9    start there -- Agent Karangekis specifically stated that

10   there was nothing that plaintiff did in the operation of her

11   motor vehicle that contributed to this accident -- this motor

12   vehicle collision.

13           More importantly, my brother just argued that there

14   was no way for Special Agent Karangekis to know that

15   Ms. Cahillane was stopped, waiting to take that left turn.

16   However, the evidence in this case shows that he was familiar

17   with the area.  He knew that there was a condo complex on the

18   left that people made turns into.

19           And the reason he didn't see Ms. Cahillane's vehicle

20   until the last second, again, was because he was distracted

21   for, I believe his testimony was, at least three to four

22   seconds, looking down, trying to find a handkerchief, playing

23   with his car.  And when he looked -- he never slowed down his

24   vehicle, so he's still travelling 45 miles per hour this

25   entire time.  And when he looked up, he admitted and conceded

1   that he just didn't have enough time to stop and that was the

2   cause of collision.

3            So based on those facts, I think the plaintiff has

4   met her burden to show that Special Agent Karangekis was

5   negligence -- I'm sorry -- was negligent and that there was

6   no comparative negligence, especially not to the level of

7   50 percent comparative negligence, on behalf of the

8   plaintiff.

9            THE COURT:  All right.  Thank you.

10           All right.  Under the rule, I'm allowed to defer.

11   The Court can decline to render a judgment until the close of

12   all evidence.  However, I am going to rule on this right now.

13           I'm going to deny the Government's motion as to the

14   negligence only because it's so abundantly clear that the

15   negligence -- the negligence in this case.

16           Agent Karangekis testified in a credible and

17   believable way about his operation of the vehicle on that

18   day.  He was familiar with the road.

19           The plaintiff in this case was not randomly stopped

20   in the middle of the road, as the Government's argument would

21   suggest if you didn't know the entire context.  Rather, she

22   was stopped to take a left into a condominium development,

23   into a large development.  Something I'm sure that

24   happens -- that I think the evidence supports a finding that

25   would happen many times a day, with residents of that

1  development stopping and taking a left.

2        So Agent Karangekis testified at length about what

3  he was doing with adjusting heat and getting a handkerchief

4  and taking his eyes off the road.  It was a straight stretch

5  of road.  And although there was testimony the respective

6  operators didn't see each other -- that is, the plaintiff

7  didn't notice cars coming or going in front of her or behind

8  her, and Agent Karangekis certainly didn't notice.  But it

9  was a fairly straight stretch of road.

10        And Agent Karangekis, from the testimony, does

11  appear to have taken his eyes off the road for a longer time

12  than would be just a normal quick action when you're driving

13  a car, you're pushing a button, you're adjusting the radio,

14  whatever it might be.

15        He testified about the seat heater and the

16  handkerchief and I have a -- I can cite in more detail.  I'm

17  looking at -- I just have a rough draft of the transcript.

18  Adjusting his -- he's adjusting his seat heater.  He's going

19  to grab a handkerchief or a rag.

20        He had to look down at the console, which is in the

21  center, and then look for the heater.

22        Apparently, he couldn't figure out the seat heater

23  and then went to grab the handkerchief.

24        And then when his handkerchief was in his hand, he

25  returned his attention to the road.

1           So there was not a description of attention, looking

2   up at the road, looking down, looking up, you know, quickly

3   trying to find things.  It didn't appear to that, from his

4   testimony.

5           But the accident and how it happened doesn't appear

6   that that's -- the circumstances and the inferences don't

7   support that he kept glancing at the road and then trying to

8   find the seat heater and do that.  Because it's a

9   straight -- it's a straight road.  And when he

10  finally -- finally; I'll use that word "finally" -- when he

11  finally put his attention back on the road, the plaintiff's

12  car was stopped.  It was in front of him.  It was ready to

13  take the left.

14          So he came upon -- he traveled an appreciable

15  distance on a fairly straight road with his eyes not looking

16  at the road in order to have come up upon the car.  The car

17  didn't just appear there.

18          He observed the car stationary in the lane.  He

19  testified he was not sure about a turn signal, but it could

20  have been on, according to Agent Karangekis.

21          He might have actually been on the telephone too,

22  while this was going on, with his daughter.  I'd have to

23  check the transcript in more detail about that, but that is

24  my memory.

25          When he looked up and the car was immediately in

1    front of him, he was so close to the car at that point, he

2    didn't have time to put on his brakes or sound the horn.

3    That's how close he was to the car.  And so then he was so

4    close to the car, he veered -- he veered to his left in order

5    to try to avoid the collision.

6           Now, of course, the plaintiff was taking a turn, a

7    left turn, turning that same direction, into the parking lot

8    or into the entry of where she lived, at the same time.  So

9    then there was -- there was that collision.

10          It's obvious that he had a duty of care, operating

11   on a road, in a public way.  It was a public way.  He was not

12   doing anything official in his duty as a law enforcement

13   agent at that point.  It is also clear, from the description

14   that I've just given of the accident, that he breached that

15   duty.  And his breach does clearly and easily pass the

16   negligence bar.

17          The contributory negligence, I'm not -- I guess I'm

18   not quite sure what that could be.  The plaintiff testified

19   they thought, from their memory, that they had -- it sounded

20   like just because it was their routine habit -- that they had

21   their blinker on.

22          But even if the blinker was not on -- and

23   Agent Karangekis wasn't quite sure -- even if the blinker was

24   not on, that is not contributory negligence in any way.

25   Because Agent Karangekis came upon that car without having

1   his eyes on the road with so little time to do anything.  He

2   couldn't even punch the horn.  He couldn't even hit the horn

3   or hit the brake.  So if there was a blinker on, it would

4   have not have made a bit of difference.  He was so on top of

5   that car at the point that he put his eyes back on the road.

6   Couldn't even hit the horn, which is, by reflex, a pretty

7   quick thing to do, or slam on the brakes, which everyone

8   knows you can do that very quickly.

9       And you look at Agent Karangekis -- he's unique in

10  the sense that he has specialized training in tactical

11  driving skills.  And even with that specialized training, he

12  was on that car so quickly by the time he looked at the road,

13  it was right there; he couldn't do anything except veer off

14  to the side.  So a blinker would have made zero difference.

15      There's absolutely nothing contributory

16  negligent -- contributorily negligent about being stopped in

17  the road before taking -- in the type of road this was, a

18  two-lane road or however many lanes of road there was --

19  there was a picture in evidence.  But from what I saw, there

20  was nothing negligent about stopping before you're taking a

21  left-hand turn into the parking lot of the condominium

22  development where you live.

23      There was absolutely no evidence that could be

24  suggested -- suggestive of something contributory on the part

25  of the plaintiff.  And as I said, if she didn't have her

1    blinker on, it would not have mattered in the least.

2            As to the injury, there is sufficient evidence at

3    this point to find that the injury was -- or injuries,

4    multiple injuries -- were related to the collision.  I think

5    the Government has clearly raised some viable issues about

6    some injuries and the nature of some injuries and the extent

7    of some injuries, as to their connectedness with the

8    accident.

9            But certainly -- and, again, easily -- at this

10   stage, the Government -- the plaintiff has demonstrated -- or

11   the evidence supports a finding that some -- perhaps a

12   substantial amount, maybe not all -- but some degree of

13   injury is clearly and easily connected as being caused by the

14   accident.

15           All right.  So we can move on.  You can call your

16   witness.

17           ATTORNEY PIEMONTE:  United States calls Special

18   Agent Casey Anderson.

19               SPECIAL AGENT CASEY ANDERSON,

20    a witness called for examination by counsel for the

21   Defendant, being first duly sworn, was examined and testified

22   as follows:

23                  DIRECT EXAMINATION

24    BY ATTORNEY PIEMONTE:

25   Q.  Good morning --

1   A.  Good morning.

2   Q.  -- Agent Anderson.

3       Are you employed?

4   A.  I am.

5   Q.  How are you employed?

6   A.  I'm a special agent with the Federal Bureau of

7    Investigation.

8   Q.  And where are you employed?

9   A.  The Springfield Resident Agency out of the Boston

10   division.

11  Q.  Could you briefly describe your educational background for

12   the Court.

13  A.  Yes.  I have a bachelor's of arts, a master's of arts, and

14   then a Ph.D.

15  Q.  And what is your Ph.D. in?

16  A.  It is in ecumenics.

17  Q.  And just for everyone's edification, what is ecumenics?

18  A.  A really simple explanation is the relationship between

19   political and religious entities and the study of those

20   relationships.

21  Q.  When did you first become employed by the FBI?

22  A.  I started my employment on September 15th of 2019.

23  Q.  And so, turning to the date in this case of the accident,

24   January 16th of 2020, where were you employed?

25  A.  I was still employed at the FBI Academy down in Quantico

1    at that time.

2    Q.  And can you describe your duties as a special agent.

3    A.  Yes.  I investigate violations of federal criminal law, do

4    other administrative matters.  I conduct trainings.  I am a

5    crisis negotiator.

6    Q.  And in terms of your investigations, do you also conduct

7    civil investigations?

8    A.  On rare occasions, yes.

9    Q.  Could you please describe your responsibilities in

10   investigating civil investigations.

11   A.  For civil investigations, we generally conduct interviews

12   in which the FBI is a party to the civil matter, generally

13   finding facts around those interviews, and may have

14   additional investigative elements, but I haven't included any

15   other investigative steps in civil investigations.

16   Q.  Okay.  And were you at some point involved with the

17   investigation of the motor vehicle accident on January 16th,

18   2020, between Special Agent Karangekis and Ms. Cahillane, the

19   plaintiff in this case?

20   A.  I was.

21   Q.  And at what point did you become involved in the

22   investigation?

23   A.  In March of 2020 I was asked to conduct an interview of

24   Ms. Cahillane.

25   Q.  Okay.  And did you conduct that interview?

1    A.  I did.

2    Q.  Was anyone with you during the interview?

3    A.  Yes.  I was with Special Agent Joe Brennan, and then

4    Attorney Thomas Rooke was also present with Ms. Cahillane.

5    Q.  At the time of the interview of Ms. Cahillane, how long

6    had you been with -- a special agent with the FBI?

7    A.  So when we are onboarded at the FBI Academy -- which was

8    September 15th of 2019 -- we're considered special agents,

9    new agent trainees.  I started my tenure at the Springfield

10   Resident Agency with -- on February 11th of 2020 but didn't

11   actually report for duty until a couple weeks after that.

12   Q.  Fair to say the interview with Ms. Cahillane occurred

13   approximately two weeks after you began at the Springfield

14   Resident Agent?

15   A.  Yes, it is.

16   Q.  Agency.  Sorry.

17       Where was the interview conducted?

18   A.  At Attorney Rooke's office.

19   Q.  And do you know who Attorney Rooke was?

20   A.  Yes.  It was Ms. Cahillane's attorney.

21   Q.  Okay.  And why was the interview at the attorney's office?

22   A.  I'm sorry.  Can you repeat that?

23   Q.  Why was the interview at the attorney's office?

24   A.  It was done at the request of either Ms. Cahillane or

25   Attorney Rooke once the FBI was notified that she retained

1    counsel.

2    Q.  What did you do for the interview, to begin the interview?

3    A.  So I initially sat down, introduced myself; my partner,

4    Special Agent Brennan.  So after introductions Attorney Rooke

5    provided some basic information about insurance claims, claim

6    numbers, and then I asked Ms. Cahillane to tell me what

7    happened on that day.

8    Q.  And did Ms. Cahillane tell you what happened on that day?

9    A.  She did.

10    Q.  What did she say?

11    A.  She said that, on the date of the accident, it was a clear

12    day; she was travelling south on Route 75 towards

13    Connecticut; that at the approximate location of Twin Silos

14    Commons, she turned on her blinker and then proceeded to make

15    a turn into Longbrook Estates, turning left, and, at that

16    moment, the collision occurred.

17    Q.  And did you take notes during the interview?

18    A.  I did.

19    Q.  And after the interview, what did you do?

20    A.  I went directly back to the office and began typing the

21    interview report.

22    Q.  And is that also known as a 302?

23    A.  It is.

24    Q.  And did you review the 302 prior to your testimony here

25    today?

1    A.  I did.

2    Q.  Now, you've described what Ms. Cahillane told you about

3     the accident.  And did she remember anything else about the

4     accident?

5    A.  She did.  She said while driving, she had her seatbelt on,

6    was not on a cell phone, was the only person in the vehicle,

7     that she used her blinker, and that she didn't remember

8     anything else about the accident as it occurred.

9    Q.  All right.  Did Ms. Cahillane say anything else to you

10     about what occurred after the accident?

11   A.  She did.  She said she remembers waking up around 9:00 and

12    on a -- an acquaintance's couch, that there was another

13    acquaintance who had been with her following the accident,

14    and that she was escorted to an ambulance, where she was not

15    transported to a hospital.

16   Q.  Did she remember being in the ambulance?

17   A.  I don't recall.

18   Q.  Did she tell you what she had done before the accident

19     that day?

20   A.  No.

21   Q.  Did she tell you whether she had had an alcoholic beverage

22     at lunch that day?

23   A.  No.

24   Q.  Did you ask Ms. Cahillane about her injuries?

25   A.  I did.

1    Q.  And what did she say?

2    A.  She had a broken fibula, neck pain, and ankle pain.

3    Q.  And did Ms. Cahillane complain to you about any other

4     injuries?

5    A.  No.

6    Q.  Did she tell you in February of 2020 that her back hurt?

7    A.  No.

8    Q.  Did she tell you that her right shoulder hurt?

9    A.  No.

10   Q.  Did she tell you that she had injured her left shoulder in

11    the accident?

12   A.  No.

13   Q.  Did she tell you that her hips were injured?

14   A.  No.

15   Q.  Did she tell you that she was suffering from increased

16    anxiety and depression after the accident?

17   A.  No.

18           ATTORNEY PIEMONTE:  If I might just have a moment,

19   your Honor.

20           THE COURT:  Mm-hmm.

21           ATTORNEY PIEMONTE:  Nothing further, your Honor.

22           THE COURT:  All right.  Thank you.

23                      CROSS-EXAMINATION

24    BY ATTORNEY MANGINI:

25   Q.  Good morning, sir.

1   A.  Good morning.

2   Q.  So just to confirm, Ms. Cahillane told you that she did

3    have her left turn signal on at the time of the collision,

4    correct?

5   A.  She did.

6   Q.  She also confirmed that she didn't remember anything after

7    the collision?

8   A.  Correct.

9   Q.  Dealing with the collision itself?

10  A.  Yes, correct.

11  Q.  Okay.  Was this your first civil interview that you had

12   done?

13  A.  It was.

14  Q.  And is it the policy and practice of the FBI to record

15   these interviews?

16  A.  It is not.

17  Q.  So you rely on the notes that you take?

18  A.  We do.

19  Q.  And in your -- did you ask Ms. Cahillane if she was in

20   medical treatment -- any treatment at the time that you were

21   interviewing her?

22  A.  I did.

23  Q.  And what did she tell you?

24  A.  She said she received physical therapy two to three times

25   a week.

1  Q.  Did you ask her what her physical therapy was for?

2  A.  I don't recall.

3  Q.  Would you be surprised that she was in physical therapy at

4   that time for neck, back, and leg pain?

5          ATTORNEY PIEMONTE:  Objection.

6          THE COURT:  Sustained.

7  A.  I --

8          THE COURT:  Objection is sustained, so you don't

9   have to answer.

10          THE WITNESS:  Sorry.

11          THE COURT:  His state of mind as to what he might

12   have known, I don't find is relevant -- if he would have been

13   surprised to learn that.

14  BY ATTORNEY MANGINI:

15  Q.  Do you have any knowledge regarding what treatment

16   Ms. Cahillane was in for which specific part of her body at

17   the time that you interviewed her?

18  A.  I do not.

19  Q.  Did you ask for those physical therapy records to check?

20  A.  I did not.

21  Q.  Did you have any follow-up conversations with either

22   Ms. Cahillane or Attorney Rooke after this initial interview

23   in March of 2020?

24  A.  I don't recall, but I don't believe so.

25  Q.  Do you have any knowledge regarding any additional

1    treatment Ms. Cahillane may have been -- may have had after

2    March 16th of 2020?

3   A.  No.

4   Q.  And, again, the purpose of the notes that you take, those

5    notes are to help you write your report after?

6   A.  Yes.  So, generally, notes include details that wouldn't

7    be easily recalled -- so things like phone numbers, account

8    numbers, directional information.  So there won't be a full

9    summary of what was said; they're just guides for parts that

10   might be necessary to recall, outside of the most substantive

11   facts that would be easily recalled, when I'm writing my

12   report.

13  Q.  Did you make any visible observations of Ms. Cahillane

14   that you remember as you sit here today?

15  A.  I was present with her, but I don't recall any of my

16   observations.

17          ATTORNEY MANGINI:  No further questions, your Honor.

18          THE COURT:  All right.  Thank you.

19          ATTORNEY PIEMONTE:  Your Honor, just one question,

20   if I may.

21          THE COURT:  Of course.

22                    REDIRECT EXAMINATION

23   BY ATTORNEY PIEMONTE:

24  Q.  Special Agent Anderson, at what point was the

25   investigation at when you were asked to interview

1    Ms. Cahillane?

2    A.  So I wasn't fully briefed at that time on the status of

3    the investigation by the case agent.  But after completing

4    the interview, I was told that the investigation had

5    concluded and that the final step had been an interview of

6    the complainant.

7    Q.  So at the time -- and without saying what other people

8    said to you -- at the time of the interview, what was your

9    understanding of the status of the investigation?

10    A.  It was my understanding that the final step in the

11    investigation was to interview the complainant, and which I

12    conducted.

13            ATTORNEY PIEMONTE:  Nothing further.

14            THE COURT:  All right.  Thank you.

15            ATTORNEY MANGINI:  Just one additional question,

16    your Honor.

17                    RECROSS-EXAMINATION

18    BY ATTORNEY MANGINI:

19    Q.  Special Agent, was the purpose of the interview to

20    determine what had actually happened in the accident in terms

21    of liability?

22    A.  I'm not sure of the grand scope of the purpose of that

23    particular interview.  I am not familiar with the

24    investigative steps that had been taken prior to that.  I

25    know that by our policy, witnesses, people involved in the

 1  accident, drivers are all required to be interviewed, and

 2  that was the last required step being taken.

 3           ATTORNEY MANGINI:  Okay.  Thank you.

 4           THE COURT:  All right.  Thank you very much.

 5           THE WITNESS:  Thank you.

 6           THE COURT:  You're all set.

 7           ATTORNEY PIEMONTE:  Your Honor, the United States

 8  calls Dr. Edward Michna to the stand.

 9           THE COURT:  All right.

10                  EDWARD MICHNA, M.D.,

11  a witness called for examination by counsel for the

12  Defendant, being first duly sworn, was examined and testified

13  as follows:

14                  DIRECT EXAMINATION

15  BY ATTORNEY PIEMONTE:

16  Q.  Good morning, Dr. Michna.

17  A.  Good morning.

18  Q.  Could you please describe your educational background for

19   the Court, beginning with college.

20  A.  Sure.  Undergrad, graduate, I went to Rutgers Pharmacy

21  School and received a degree in pharmacy.  I then went to

22  Seton Hall Law School.  And I got a degree of the J.D.  And I

23  passed the New Jersey bar.

24     I then decided to go to medical school.  I went to New

25  Jersey medical school in Newark, New Jersey, UMDNJ.  I

1    received my M.D.

2    Q.  What year did you receive your M.D.?

3    A.  I believe it was '91.

4    Q.  And could you please also describe for the Court your

5     postdoctoral training.

6    A.  Sure.  I did a medical internship at Monmouth Medical

7    Center in New Jersey.  And then I proceeded to do an

8    anesthesiology residency at Brigham and Women's Hospital in

9    Boston.  And, additionally, I did a year of a pain fellowship

10    also at Brigham and Women's Hospital in Boston.

11    Q.  Do you hold or have you held any faculty academic

12     appointments?

13    A.  Yes.  I'm assistant professor at Harvard Medical School.

14    And I'm a staff physician at Brigham and Women's Hospital,

15     staff anesthesiologist.

16    Q.  Are you affiliated -- and you partially answered

17     this -- are you affiliated with any hospitals or

18     institutions?

19    A.  Yes.  Brigham and Women's Hospital as well as Dana Farber

20    Cancer Institute.

21    Q.  And what -- did you mention a -- Brigham and Women's

22     Hospital, did you say "pain institute"?

23    A.  Pain clinic.  I did a pain fellowship there, yes.

24    Q.  Okay.  Are you currently affiliated with the Brigham and

25    Women's Hospital --

1   A.   I am.

2   Q.   -- Pain Management Center?

3   A.   I am.

4   Q.   And what is that?

5   A.   It's an academic pain management center.  We see all

6   chronic pain patients.  That's a tertiary referral center.

7   We also engage in teaching and educating fellows as well as

8   medical students and anesthesia residents as well as rotating

9   residents from across the country.

10  Q.   You testified that it's -- that the Pain Management Center

11   at Brigham and Women's Hospital is a tertiary referral

12   center.  What does that mean?

13  A.   Basically, it means that we get referrals from all

14  sources -- primary care, other pain centers, other

15  specialists.  Frequently, we see patients that have been very

16   resistant to care at other institutions.

17  Q.   And you testified that one of the positions you hold is as

18   a clinical anesthesiologist; is that correct?

19  A.   That's correct.

20  Q.   And what are your responsibilities as a clinical

21   anesthesiologist?

22  A.   Well, I don't practice anesthesia anymore.  But based on

23   the title, I practice pain medicine at the Brigham and see

24   patients clinically four to five days a week.

25  Q.   So do you manage a panel of patients currently?

1  A.  Yes.  I have thousands of patients that I manage.

2  Q.  And for how long have you been managing a panel of

3   patients at -- in anesthesia?

4  A.  I ended my fellowship in '96.  So since 1996.

5  Q.  And could you describe briefly, if you would, your service

6   on any committees, if any?

7  A.  Working on multiple committees over the years.  I served

8   on the FDA advisory board for anesthesia and analgesia

9   products.  I've been on opioid committees for the hospital

10  and Children's Hospital.

11      I've been on committees for the American Pain Society

12  involving advocacy work in Washington.  I've done -- I've

13  served on various organizational panels for both the American

14  Pain Society as well as the American Academy of Pain

15  Medicine.

16  Q.  And the committee you mentioned -- the advisory committee

17   for the FDA on anesthesia and analgesia, is that a national

18   committee?

19  A.  Yes.  I mean, it's basically a, you know, government

20  committee that is set up to aid the FDA when they need

21  specialty knowledge in a particular area.  So I was invited

22  for my pain management knowledge and skills as well as

23  palliative care and, also, on some of the

24  addictive -- addiction medicine components.

25  Q.  Have you received any honors or awards?

1    A.   I have.   In pharmacy school, I got an honor -- I was on

2    the honor society for -- I don't remember the name of it was.

3    I've received awards from the American Pain Society for

4    long-term achievement.   And I've also been awarded service

5    awards for the -- also for the American Pain Society.

6    Q.   Have you authored any peer-reviewed articles or

7    publications?

8    A.   I have probably over 50 peer-reviewed articles that have

9    been published -- mostly in the area of pain but also

10   anesthesia and symptom management.

11   Q.   In what capacity, if at all, have you served in editorial

12   activities?

13   A.   I've been a reviewer for numerous journals since I

14   graduated from fellowship.   Virtually all of the national and

15   international pain journals I've served on.

16   Q.   And are those journals peer-reviewed journals?

17   A.   Yes.

18   Q.   And could you summarize the names of the journals on which

19   you served as a reviewer?

20   A.   Oh, boy.   Pain -- there are numerous -- I can't remember

21   all of the names of the pain journals.   Also, *JAMA* and a lot

22   of the major medical publications.

23   Q.   And *JAMA* stands for what?

24   A.   Journal of the American Medical Association, I believe.

25   You're asking all of the difficult questions now.

1  Q.  Have you been invited to give presentations in pain

2   management?

3  A.  Yes.

4  Q.  About how many presentations have you been invited to

5   give?

6  A.  Oh, probably over hundreds over the years -- mostly on the

7   illegal aspects of pain medicine, but on various topics,

8   chronic pain and opioid therapies.

9  Q.  Do you hold licenses or certification?

10  A.  Yes.  I'm boarded in anesthesia.  I'm boarded also in pain

11   medicine and boarded also in palliative care medicine.  I'm

12   licensed in the State of Massachusetts as well as the state

13   of California.

14  Q.  And what does it mean -- you said you were boarded.  Is

15   that board certification?

16  A.  That's correct, yes.

17  Q.  What does it mean to be board certified?

18  A.  You've had the educational background, and then you passed

19   an exam documenting your competence to practice that field.

20  Q.  And do your licenses and your board certifications remain

21   in good standing?

22  A.  Yes.

23  Q.  Have they ever been -- the licenses or your board

24   certifications -- suspended, revoked, or disciplined?

25  A.  No.

1  Q.  And are there requirements to maintain board

2   certification?

3  A.  There is.  For palliative care and pain, there are what

4   they call continuing education requirements as well as

5   taking -- answering questions, so many a year.  And, you

6   know, you have to, obviously, answer so many correct and

7   there's certain criteria to continue.

8      As far as anesthesia, I am what they call "grandfathered,"

9   meaning that I don't need to take any additional examinations

10  in anesthesia.

11 Q.  Are you required to take continuing education?

12 A.  Yes.

13 Q.  And have you fulfilled all requirements necessary to

14  maintain your board certifications?

15 A.  I have.

16 Q.  Have you ever testified as an expert before?

17 A.  Yes.

18 Q.  On whose behalf?  Meaning, plaintiffs or defendants or

19  both?

20 A.  I have represented both sides.  Probably approximately

21  50/50, around that.

22 Q.  Okay.  Has a court ever found that you were not qualified

23  to testify as an expert?

24 A.  No.

25 Q.  Has your testimony ever been excluded by any court?

```
 1   A.  No.
 2   Q.  Were you retained by the United States to provide an
 3    expert opinion in this case?
 4   A.  I was.
 5   Q.  And are you being compensated for your professional
 6    services?
 7   A.  I am.
 8   Q.  Did you review any documents or other materials in this
 9    case in order to form your opinion?
10   A.  I did.
11   Q.  What is it that you reviewed?
12   A.  If you had a copy of my report, I could enumerate them.
13          ATTORNEY PIEMONTE:  May I approach, your Honor?
14          THE COURT:  Yes.
15   BY ATTORNEY PIEMONTE:
16   Q.  I'm going to show you a copy of the amended report dated
17    April 28, 2024.  And let me just ask you, Dr. Michna -- is
18    that the correct date of the -- you authored the report?
19   A.  No, it isn't.  It was '25.
20   Q.  '25?  Okay.
21   A.  Nobody gave me credit for typing skills.
22   Q.  That's not a requirement for board certification?
23   A.  Unfortunately not.  It's probably due to my age also.  I'm
24    not as savvy as I should be, probably.
25   Q.  Not going there.
```

1        Dr. Michna, what materials is it that you reviewed in

2     order to form an opinion in this case?

3   A.  Well, I referred -- I reviewed the disclosures of

4   Dr. Feliz, the pain physician that saw her for an IME.  I

5   also saw the AFC Urgent Care records; the Baystate Shield

6   MRI; the Baystate Rehabilitation records; the Greater

7   Springfield MRI reports; Hampden County Chiropractic; Meeks

8   and Zilberfarb Orthopedic reports; New England Orthopedic

9   Surgeons; Orthopedic Care Center; Pioneer Spine and Sports

10  Medicine; Providence Diagnostic Imaging results; Springfield

11  Medical Associates notes; and the Trinity Health of New

12  England and Mercy Medical Center records.

13  Q.  Did you also conduct an examination of Ms. Cahillane?

14  A.  I did.

15  Q.  And when did you conduct that examination?

16  A.  That was in March of 2025, I believe.

17  Q.  Okay.  And if you --

18  A.  I think it was, actually, April.  I think that might be

19  a --

20  Q.  Would it help you to look at your report to refresh your

21   recollection on what date?

22  A.  Yeah.  I mean, the date on the report says 3/18/25.

23  Q.  Okay.  And if you could just make sure the microphone is

24   near you.

25        Thank you.

1    Now, you said you conducted an examination.  What do you

2    typically do -- just briefly describing what you typically do

3    during an examination.

4    A.  Well, we ask, usually, you know, what is -- what is the

5    current problem that you're suffering from, in terms of pain.

6    We ask to try to get a history of that problem.

7    And then we do what we call a focused exam.  We focus on

8    the areas specifically that patients are complaining about

9    pain.

10   Q.  And I'll get to the specifics of the exam in a bit.  But

11   did you follow that practice of obtaining a history and

12   asking questions in this particular case?

13   A.  I did.

14   Q.  And are the opinions you rendered today -- are they

15   rendered to a reasonable degree of medical certainty?

16   A.  Yes.

17   Q.  Now, what is past medical history?

18   A.  It's basically all of the medical problems that a patient

19   has suffered from, up until the time of the office visit.

20   Q.  And in forming your opinions in this case, did you

21   consider Ms. Cahillane's past medical history?

22   A.  Yes.

23   Q.  And based on your review of the records and the statements

24   made by Ms. Cahillane during your examination, what was your

25   understanding of past medical history at the time you

1    authored this report?

2    A.   Basically, she had a history of blood pressure issues;

3    esophageal reflux, or GERD disease.  She had various joint

4    and back and neck pain issues.  And she also -- let's see.

5    Q.   Are you referring to your report to refresh your

6    recollection?

7    A.   I am, yeah.  She had a recent diagnosis of diabetes three

8    years prior.  And then she had a history of anxiety and

9    depression and high cholesterol.

10   Q.   And had each of these conditions been diagnosed before the

11   motor vehicle accident in 2020?

12   A.   I believe the diabetes was diagnosed after.  But all of

13   the other ones, I believe, yes.

14   Q.   And was Ms. Cahillane prescribed any medication for the

15   conditions you've just described, prior to the accident?

16   A.   Yes.

17   Q.   Now, do you also inquire about social history during an

18   examination?  Do you also consider social history?

19   A.   We do.

20   Q.   And what is social history?

21   A.   Well, it's frequently -- involves lifestyle issues,

22   whether you are -- drink alcohol, whether you abuse any

23   medications, and any other factors that -- in terms of

24   lifestyle and what you -- how you live your life.

25   Q.   Why do you consider a person's social history during an

1    examination?

2    A.   Well, I mean, if somebody's actively abusing medications,

3    obviously, that's a major factor.  Or alcohol, in terms of

4    what medicines you would prescribe and how you would approach

5    treatment, would have a major factor.  And --

6    Q.   In addition to reviewing the medical records that you've

7    described, did you also ask Ms. Cahillane about her social

8    history during your examination?

9    A.   I did.

10   Q.   And what was your understanding of Ms. Cahillane's social

11   history at the time of the examination?

12   A.   Yeah.  She said in the past, many years ago, she was a

13   smoker.  She had quit all alcohol use five years prior.

14       I'm going to just take a quick look here, see if I missed

15   anything.

16       Yeah.  And then she also -- she denied any misuse of

17   illicit substances.

18   Q.   Did Ms. Cahillane report to you any struggles with

19   alcoholism?

20   A.   No, she did not.

21   Q.   Did she report to you any diagnosis of alcoholism?

22   A.   No, she did not.

23   Q.   At the time of your examination, was Ms. Cahillane

24   prescribed any medications?

25   A.   She was.  When I asked her, she had trouble remembering

1    the exact medications.  And the ones I listed on the report

2    was what she had told me:  That she was on two blood pressure

3    medicines; she was on the venlafaxine; she was on omeprazole

4    for her gastroesophageal reflux disease; and she was on

5    hydrocodone, or Vicodin, for her pain conditions.

6    Q.  Was she on any medications for her blood pressure?

7    A.  Yeah.  She had said she was on two medicines.  She didn't

8    know the names of them.  And she said there was maybe other

9    medicines, but she couldn't remember what they were.

10   Q.  And you described that Ms. Cahillane was on Vicodin or

11    hydrocodone.  For what reason was Ms. Cahillane prescribed

12    the medication, to your understanding?

13   A.  I believe, from reviewing the primary care notes, that

14    initially it was due to chest wall pain after a reduction

15    mammoplasty.  And it seemed to be continued throughout the

16    years.  She complained of various joint pains and everything.

17   And I think that was, you know, treating not only the chest

18   wall but some other joints and related pains.

19   Q.  And you mentioned venlafaxine.  What is that medication

20    prescribed for?

21   A.  It is an antidepressant and usually used to treat

22    depression and possibly anxiety.

23   Q.  And was Ms. Cahillane prescribed the medications that

24    you've just testified about before the accident in 2020?

25   A.  I don't know the blood pressure medicines were the same,

1    but certainly she was on the same two hydrocodone tablets and

2    she was on venlafaxine before.

3    Q.  In your review of the medical records, did you review

4     medical records for both the time period before and after the

5     motor vehicle accident?

6    A.  I did.

7    Q.  And in your review of the medical records for the time

8     period after the motor vehicle accident, did you notice any

9     increase or see any increase in either the Vicodin or the

10    venlafaxine?

11   A.  I'm not sure about the venlafaxine.  There might have been

12    a small increase at some point, but it was not a huge

13    difference.

14        In terms of the hydrocodone, I don't believe there was an

15    increase from prior to the accident.  There were periods,

16    obviously, when she had surgeries, that she was probably

17    giving -- given additional medicine for the acute pain.  But

18    in terms of her primary care, I believe that he maintained

19    her on the same dose before and after.

20   Q.  And in forming your opinion in this case, did you also

21    consider Ms. Cahillane's past surgical history?

22   A.  Yes.

23   Q.  And why do you consider that?

24   A.  Well, again, if you're having certain pains and -- reach

25    into the body, you want to know if there's been surgery

1    there, if there's been hardware, there's been possible scar

2    tissue and scarring.  And all of that impacts, obviously, on

3    what you're seeing on the exam.

4    Q.  And based on your examination and the medical records in

5    this case, what's your understanding of what Ms. Cahillane's

6    past surgical history was, at least at the time of your

7    examination?

8    A.  She had had a recent right shoulder surgery.  She had two

9    surgeries on her left shoulder, rotator cuff injury.

10        Again, I'm going to refer to my notes here -- I mean, the

11   report.

12        Oh, again, she had the reduction mammoplasty that was done

13   prior to the accident.  And she had two meniscal surgeries on

14   her left knee.

15   Q.  Okay.  And in terms -- just to put the surgeries into

16   context, when was her right shoulder surgery?

17   A.  It was several years after.  It was several months before

18   I saw her on the IME.  So somewhere in 2004 [sic].

19   Q.  Would looking at your report help you recollect the exact

20   date?

21   A.  Sure.  I can take a look.

22   Q.  And I'll direct you to page 2 of your report.

23   A.  Yup.  The right shoulder surgery was on 10/23/24.

24   Q.  And you also testified about left shoulder surgeries.

25   What were the dates of those left shoulder surgeries that you

1    noted?

2    A.  On my report I noted as July 1st, '20 and then 5/5/21.

3    Q.  You mentioned that there had been knee surgeries for

4    meniscal tears on her left knee.  What was the dates of those

5    surgeries?

6    A.  Well, I have listed one of the dates as 5/22/23.  I'm not

7    sure what the other date was.

8    Q.  Did you also -- is there also something called "history of

9    present illness" that you consider during an examination?

10   A.  Yes.

11   Q.  And what is "history of present illness"?

12   A.  It's basically what's going on now, what are her

13   complaints, what are the current medical issues that are

14   evolving at that point.

15   Q.  Did you obtain a history of present illness in this case?

16   A.  I did.

17   Q.  And how do you obtain it?

18   A.  I ask open-ended questions of, you know, "What's your

19   current pain?  When did it start?  What's the -- what events

20   occurred?  And how did you treat it?"

21   Q.  And could you summarize the information that you obtained

22   from Ms. Cahillane as part of a history of present illness.

23   A.  Sure.  So she -- she relayed to me that she was involved

24   in the motor accident that occurred in January of 2020 and

25   that she was T-boned and that she initially didn't seek any

1   medical care but eventually sought care.

2       She had seen her primary care doctor, who diagnosed her

3   with strains of her neck and low back and contusions of her

4   left shoulder and left knee and left lower leg.

5       She went back a month later to the primary care, still

6   complaining of it -- of the lower left leg pain.  He did an

7   X-ray.  And she was diagnosed with a fibular fracture that

8   was nondisplaced and healing at that point.

9   Q.  Did she mention to you whether she had been attending

10   physical therapy?

11  A.  I know she was referred to physical therapy.  I did not

12   elicit from her how many visits she went to or anything like

13   that.

14  Q.  And was there more than one X-ray of her leg --

15  A.  Uhh --

16  Q.  -- to your knowledge?

17  A.  I believe there was.  I think there was one X-ray that did

18   not reveal the fracture and was -- the subsequent X-ray that

19   showed it.

20  Q.  And when you say "the fracture," what fracture do you

21   mean?

22  A.  This is a fibular fracture.

23  Q.  And what kind of fibular fracture did Ms. Cahillane

24   sustain?

25  A.  It was what they describe as a nondisplaced.  So there was

1   no movement of the bone on each other and it was in the

2   neutral position.

3   Q.  Did the fracture of her fibula require surgery?

4   A.  No.

5   Q.  What was the treatment -- to your understanding, what was

6    the treatment for the left fibula fracture?

7   A.  Usually there isn't.  It's just -- you're allowed to just

8   heal when it is nondisplaced.

9   Q.  As part of your obtaining a history of Ms. Cahillane's

10   present illness, did you also ask her about her activity

11    levels before and after the accident?

12  A.  Yes.  She had told me that she was a very active person,

13   that she biked, played golf, gardened, hiked, was a very

14   active person.  And then she said that after her -- after the

15   accident, that her life totally changed and she could no

16   longer do any of those things.

17  Q.  Did you look at medical records -- in terms of obtaining a

18    history of present illness and the statements made by

19   Ms. Cahillane with regard to her activity level, did you

20    review medical records for corroboration of those claims?

21  A.  Well, I had reviewed her primary care records prior to the

22   exam.  And certainly, in those records, they didn't correlate

23   with what she was describing to me.

24      The primary care records frequently said that she had very

25   low activity levels and he was concerned about her, you know,

1    cardiac health and her weight issues.  And they also -- it

2    also described that she suffered from depression and anxiety.

3        She had various -- throughout the visits, there are

4    various joint complaints, from her hands to her right

5    shoulder to her low back, to her neck.  But the -- it didn't

6    seem like there was a consistent pattern there.  It would be

7    different complaints on different visits.

8    Q.  Was Ms. Cahillane prescribed opioids for those joint neck

9     and low back pains?

10   A.  Well, again, she was on a constant dose of two

11   hydrocodone -- again, since the reduction mammoplasty.  And

12   it is hard to tease out exactly what the primary care was

13   actually treating at that point.  But he maintained it after

14   the point -- I didn't see any complaints of chest wall pain.

15   So I'm assuming -- I can only make the assumption -- that he

16   was treating the other pains with the opioids.

17   Q.  And those joint neck and low back pains that you testified

18    about, did they exist prior to the accident?

19   A.  Yes.

20   Q.  And did you ask Ms. Cahillane about the discrepancy or the

21    difference between your review of the medical records and the

22    statements that she was making to you?

23   A.  Yes.  I politely asked her that could she explain why,

24   when I looked at the medical records, that I didn't -- it

25   didn't correlate with what she was saying.  And she -- and I

1   go, "Do you have an explanation for that?"

2       And she says, "No, I can't explain."

3   Q.  Now, on the day of the examination, what were

4    Ms. Cahillane's complaints of pain?  And this is your

5    examination April of 2025.

6   A.  Okay.  Yeah.  Well, you're asking what I found on my exam.

7       So she was complaining of pain on the medial or the inner

8   aspect of her left knee.  And she was complaining of

9   left-sided low back pain.

10      And I can go through my physical exam if you want me to

11  iterate that or...

12  Q.  I will.  Did you discuss -- let's go to your physical

13   examination while we're there.

14      You conducted a physical examination of Ms. Cahillane.

15   Can you please describe that for the Court.

16  A.  Sure.  We'll go from head to tail -- legs.  But we'll

17  start at the neck.

18      I had her move her neck.  She had full range of motion,

19  side to side and up and down.  I palpated her neck.  She -- I

20  could not reproduce any discomfort with palpation.

21      Then I proceeded to examine her shoulders.  I palpated her

22  shoulders.  They didn't -- I could not reproduce any pain.

23      And then I had her on each shoulder independently, to move

24  her arm in all planes -- front, side, over.  And she appeared

25  to have full range of motion in all -- in both shoulders.

1      I then proceeded to examine her low back.  And I palpated
2   her low back.  She did have pain over what I would say was
3   her L5-S1 facet joint on the left side.  I stressed that
4   joint by having her extend her spine and lean back.  That
5   stresses that joint.  And, indeed, that made her pain worse.
6      I had her lean forward and the pain was much better.  So
7   my feeling was that her pain was coming from that L5-S1
8   left-sided facet joint.
9      On the upper extremities, I also did -- had her move her
10  arms and judged her muscle strength, pulling in and pushing
11  out.  And she had what I would describe as full strength on
12  both of those movements.
13     In terms of her hips, I rotated her hips.  She didn't
14  complain of and had relatively full motion of her hips.
15     I then proceeded to examine her knees.  Had her move her
16  right and her left knee.  She did have pain on the inner or
17  the medial aspect of the left knee.
18     I had her extend her leg out and then pull in, again, to
19  try to assess muscle strength.  On the right, she had full
20  strength.  On the left, she had -- she exhibited what we
21  would say would be "giveaway weakness," meaning that she
22  started to have pain when she extended her knee, and she
23  stopped moving it at that point.
24     I did a sensory exam, also on her upper and lower
25  extremities, to light touch.  And she had no deficits in

1    terms of sensation to light touch.

2        I had her walk.  And she was able to walk and ambulate

3    without difficulty.

4    Q.  And I'm sorry if I'm repeating something.  You said that,

5    with the exception of her left knee due to the pain in her

6    medial aspect, she had a muscle -- full muscle strength in

7    her lower extremities; is that correct?

8    A.  I would say, yes; she had full strength.

9    Q.  Did she have full muscle strength in her upper

10   extremities?

11   A.  Yes.

12   Q.  And you mentioned that there was tenderness of the spine

13   over the L5-S1 facet joint; is that right?

14   A.  That's correct.

15   Q.  Did she have any other tenderness of the spine?

16   A.  No.  I specifically -- because there was documentation of

17   spinal fractures at T12-L2 -- some of the records say a 1 but

18   I think it was T12 and L1 -- I specifically pressed over that

19   area of her spine.  And I could not reproduce any pain.  And

20   that's not where she was complaining of the pain.

21   Q.  Did -- you mentioned about having her bend this way and

22   that, in terms of her lumbar spine.

23   A.  Mm-hmm.

24   Q.  What was her assessment in terms of her flexion or

25   movement of her spine?

1    A.  Yeah.  She had full -- full flexion.  And, again, when she

2     extended, she had pain.  So that was somewhat limited.

3    Q.  Did you also make visual observations of Ms. Cahillane

4     either before or during the examination?

5    A.  I did.  I was -- I went out and got her in the waiting

6     room.  And I have to say I was kind of shocked, based on all

7     of the medical records and what I had seen, that I -- you

8     know, she seemed a lot better than what I had seen in the

9     medical records, just at a general -- just a general

10    appearance.  And she walked into the exam room without

11    difficulty.  She smiled.  She was very gracious, very

12    interactive.

13   Q.  There's a term in medical -- in the medical field called

14    "alert and oriented."  Did you do an assessment to determine

15     whether Ms. Cahillane was alert and oriented?

16   A.  Yes.

17   Q.  Can you describe --

18   A.  Basically, the patient is not sleeping and sedated, and

19    able to respond.  So that's alert and oriented.

20   Q.  Based on your review of the medical records in this case

21    and your examination of Ms. Cahillane, did you form an

22    opinion to a reasonable degree of medical certainty as to

23    Ms. Cahillane -- as to your overall assessment of

24    Ms. Cahillane as it related to her complaints of pain?

25   A.  Sure.  I mean, basically there was -- as I said, that she

1  had pain in the medial or the inner aspect of her left knee.

2  There was a recent scan that showed some cartilage tear and

3  that would correlate with what she was suffering.

4      And the pain over the left side, over the L5-S1 facet

5  joint -- she's had X-rays in the past that showed that.  And

6  I believe that was the continuing source of her pain.

7  Q.  In terms of recovery from her surgeries and her injuries,

8  did you form a conclusion to a reasonable degree of medical

9  certainty about the status of her recovery?

10  A.  Yes.

11  Q.  And what was that opinion?

12  A.  Well, based on my own exam and other -- her orthopedic

13  records, it seems that, in terms of the shoulder surgeries,

14  she has full range of motion and her strength has returned.

15  So as to that, I think she's fully recovered.

16      In terms of the fibula fracture, there was certainly no

17  description of pain in the area of the fracture, and there

18  was no pain when I examined her in that area.

19  Q.  Did you assess the functional limitations, if any, of

20  Ms. Cahillane?

21  A.  Again, I -- I didn't do a full functional evaluation.

22  It's an expertise that is beyond my -- you know, my

23  expertise.  But in terms of -- if you're asking about range

24  of motion and function and strength, she had -- she had

25  maintained full function and range of motion.

1          ATTORNEY PIEMONTE:  If I might just have a moment.

2     BY ATTORNEY PIEMONTE:

3     Q.  Okay.  So based on your -- the medical records that you

4      reviewed, your training, your education, your experience,

5      your examination of Ms. Cahillane, did you form an opinion to

6      a reasonable degree of medical certainty with regard to her

7      pain complaint in her left knee?

8     A.  Yes.

9     Q.  And what is that opinion?

10    A.  Well, that's -- I'm going to refer to my report here also.

11         She had complained of the left knee pain prior.  Prior

12    scans had shown that she had degenerative disease and

13    arthritis of the knee.  She saw orthopedic surgeons.  And in

14    their notes, they also documented that she had pain over four

15    years, which --

16    Q.  Let me just stop you there.

17         What was the date of the note indicating that she had

18     experienced pain for over four years?

19    A.  That was February 28th, '22.  And she --

20    Q.  What was the treatment for that?

21    A.  Yeah.  They had treated her with steroid injections and

22     what was referred to as viscosupplements, which is basically

23     placing a gel-like substance in the knee to smooth its

24     ability to slide over each other.

25         She did have arthroscopic surgery.  And recently, as I

1    said, she had that -- the medial pain which they attributed

2    to a cartilage tear.  That was new.

3    Q.  I was going to ask.  So the cartilage tear was new?

4    A.  Yes.

5    Q.  But there were these other complaints of pain for which

6    she had surgery prior to the motor vehicle crash?

7    A.  That's correct.

8    Q.  What, if at all, was she diagnosed with in terms of the

9    knee pain for which she was treated with steroids and

10   supplements?

11   A.  Basically, arthritis and degeneration of the knee.

12   Q.  Degeneration of the knee.

13      And did you come to a conclusion to a reasonable degree of

14   medical certainty as to whether there was any relationship

15   between the deterioration of her left knee joint and the

16   motor vehicle accident?

17   A.  Yes.

18   Q.  And what is that conclusion?

19   A.  I didn't see a relationship between the injuries from the

20   auto accident and the -- what I would describe as a natural

21   degeneration of a joint.

22   Q.  Why not?

23   A.  She had it prior.  And it's just a natural -- as we age,

24   our joints degenerate.  So she had the process; it was

25   already started; and that process continued.

1  Q.  Same question, Dr. Michna, with regard to Ms. Cahillane's

2   complaints of low back pain.

3      Did you form an opinion to a reasonable degree of medical

4   certainty about the cause or the reason for Ms. Cahillane's

5   low back pain complaints?

6  A.  Yes.

7  Q.  And what is that opinion?

8  A.  Again, I think it was due to an ongoing prior degeneration

9   of the spine and arthritis of the spine that -- that, you

10  know, has probably progressed since that time.

11 Q.  Did your review of the medical records note any diagnoses

12  with regard to degenerative disease of the spine?

13 A.  Yes.

14 Q.  And what is that?

15 A.  I mean, she has arthritis of the facet joints.

16 Q.  Is there a diagnosis called "degenerative disk disease"?

17 A.  Yes.  That's where the disk material is starting to

18  degrade in between the bones of the spine.

19 Q.  And you mentioned earlier in your -- and I'm sorry.  Let

20  me ask a follow-up question to that.

21     Is degenerative disk disease something that also naturally

22  progresses with age?

23 A.  It does, yes.

24 Q.  You discussed the back pain that Ms. Cahillane was

25  complaining about.  And in that testimony, you referred to a

1    compression fracture of the T12-L2 or maybe L1.  Could you

2     please describe that for the Court.

3    A.   Describe the --

4    Q.   Where is the area --

5    A.   -- X-ray?

6    Q.   -- of T12-L2?

7    A.   So T12 is at the lower part of your rib cage.  So it is

8     midback.  And L1 is right -- well, 1, 2, right underneath it.

9     So it is upper -- it is mid- and upper-back pain.  Low back

10    pain.

11   Q.   And the complaints of low back pain that Ms. Cahillane

12    had, did they exist before the accident?

13   A.   From what I see from the record, yes.

14   Q.   And the complaint that Ms. Cahillane was -- of back pain

15    that she was complaining about on the date of your

16    examination, where was that located?

17   A.   Again, it was in the very low portion of the lumbar, or

18    the lower level of the spine.

19   Q.   Did your examination or her complaints indicate that she

20    had any pain in the area of the compression fracture at

21    T12-L2?

22   A.   No.  I stressed the spine at both of those levels, and she

23    had no pain response at those levels.

24   Q.   Can I ask, Dr. Michna, are compression fractures usually

25    chronically painful?

1  A.  They tend to -- what we call -- "fibrose," meaning they

2  heal.  There's a process where the body builds fibrotic

3  tissue around it to try to stabilize it.

4      So, in that sense, they don't become symptom -- they

5  aren't necessarily long-term symptomatic, in terms of pain.

6  Q.  Did you note, either on examination or in the medical

7  records, whether Ms. Cahillane had a leg length discrepancy?

8  A.  She had seen an orthopedic surgeon several years after the

9  accident.  And he felt that she had pain in her sacroiliac

10  joints.  And she referred it -- referred her to a physiatrist

11  for injection therapy.

12      And he -- and the ortho felt she had a leg length

13  discrepancy.  And the physiatrist did do the injections, but

14  they didn't seem to help with her pain that she was suffering

15  from.

16  Q.  Where are the sacroiliac joints, Dr. Michna?

17  A.  They're in your pelvis.  They're much lower than where the

18  spine -- the spine ends here -- and they would be on the

19  sides, on the lower pelvic area.

20  Q.  So based on the records that you reviewed and your

21  examination of Ms. Cahillane, were you able to form an

22  opinion to a reasonable degree of medical certainty as to

23  whether there was a relationship between her chronic low back

24  pain and the motor vehicle accident?

25  A.  Well, on my exam, I -- my diagnosis was that her pain was

1  coming from her left lumbar facet disease that was -- that

2  existed prior to the accident and certainly continued to

3  exist.

4  Q.  I'm now going to move to the lower left leg pain after the

5  accident.

6      Did Ms. Cahillane experience lower left leg pain as a

7  result of injuries?

8  A.  Yes.

9  Q.  And could you -- did you see any records or did the

10  examination reveal any continuing pain of lower left leg

11  injuries?

12  A.  Well, on my exam, she had no pain there.  And I did not

13  see in the recent medical records that she was complaining of

14  pain there.

15  Q.  Moving on to the neck -- well, let me ask you:  Did you

16  form an opinion to a reasonable degree of medical certainty

17  whether the pain from the fibula bone fracture had resolved?

18  A.  Yes.

19  Q.  And what is that opinion?

20  A.  I -- I didn't elicit any pain.  And she didn't even

21  describe any pain over the area when I spoke to her.

22  Q.  And I'm moving to neck pain now.

23  A.  Okay.

24  Q.  Did Ms. Cahillane, based on your review of the medical

25  records -- did she complain of neck pain prior to the motor

1   vehicle accident?

2   A.  Yes.

3   Q.  And what is your understanding of the cause of the neck

4    pain?

5   A.  Well, she had some X-rays, and they described it as mild

6    degenerative disease of the cervical spine.

7   Q.  And like the other degenerative diseases that you've

8    testified about, does that degenerative disease of the neck

9    also progress over time?

10  A.  Yeah, usually.

11  Q.  And you described your examination of Ms. Cahillane.  And

12   did you form an opinion to a reasonable degree of medical

13   certainty whether the pain in her neck had any relationship

14   to the motor vehicle accident?

15  A.  Well, she had no pain -- she didn't relate any pain on my

16   exam or -- I had her move her neck.  She didn't say she was

17   having pain when I saw her.  But throughout the -- you know,

18   prior, she had complaints of that, as well as after.  But on

19   my visit with her, that wasn't noted as a painful area.

20  Q.  To a reasonable degree of medical certainty, are

21   degenerative issues related to the motor vehicle accident?

22  A.  No.

23  Q.  And I believe you testified about her range of motion in

24   her neck?

25  A.  Yes.  She had full -- there was no restrictions on her

1   movement of her neck, either side to side or up or down.

2   Q.  And was her pain to palpation of her neck?

3   A.  No.

4   Q.  Moving to the left shoulder pain, Dr. Michna.  Did you

5    form an opinion to a reasonable degree of medical certainty

6    whether the injury and tear to her left shoulder, the rotator

7    cuff -- was it related to the motor vehicle accident?

8   A.  Well, certainly, you know, there's documentation that

9    there was a tear after the accident, yes.

10  Q.  Did you review records of a two-year follow-up in 2022 of

11   the shoulder?

12  A.  I did.

13  Q.  And what is it that you were able to discern at the

14   two-year follow-up?

15  A.  The orthopedic doctor showed that the -- documented that

16   the shoulder was healing well and there was no new tears or

17   arthritis.

18  Q.  And on your examination, was there tenderness in that

19   area?

20  A.  No.

21  Q.  What was her range of motion in her left shoulder?

22  A.  I would describe it as full.

23  Q.  Moving to the left hip pain that Ms. Cahillane claims.

24   Did you see any complaints in the medical records as to

25   lateral hip pain?

1  A.  Yeah.  I don't remember seeing anything prior.  And there

2  was several years after the accident, I believe in January of

3  '24, she had hip X-rays, which were negative.  She was

4  diagnosed with trochanteric bursa -- bursitis, and she

5  received some injections.

6  Q.  What's trochanteric bursitis?

7  A.  Basically, it is inflammation of a bursa.  It is where the

8  tendon -- muscle tendon slides over part of the lateral hip

9  bone.  And the bursa is meant to protect the tendon from

10  injury.  And it's frequent as -- again, as we age -- that

11  that bursa can get inflamed.  And it is a very common

12  diagnosis.

13  Q.  Are any complaints -- let me rephrase.

14     Is trochanteric bursitis, the diagnosis for

15  Ms. Cahillane -- is that related to the motor vehicle

16  accident of 2020?

17  A.  Not that I could -- could say, no.

18  Q.  On your examination, what was Ms. Cahillane's range of

19  motion of her hip?

20  A.  She had -- as a -- again, I would describe full range of

21  motion of both hips.

22  Q.  Did she complain of any pain in her hips during your

23  examination?

24  A.  No.

25  Q.  In terms of anxiety and depression, from your review of

1    the medical records and your interview with -- I'm

2    sorry -- and your examination of Ms. Cahillane, did you form

3    an opinion to a reasonable degree of medical certainty

4    whether her anxiety and depression was caused by the motor

5    vehicle accident?

6    A.  Well, I'm not a psychiatrist.  But certainly in the

7    medical record, there's clear documentation that she had

8    depression and anxiety for many years prior to the accident.

9    Q.  Was the depression and anxiety treated with medication

10   prior to the accident?

11   A.  Yes.

12   Q.  Was there any new interventions taken for her depression

13   and anxiety after the motor vehicle accident?

14   A.  I mean, I believe she maintained on the same venlafaxine

15   medication.  I didn't see any consultations for psychiatry or

16   referrals out for that by the primary care.

17   Q.  As to Ms. Cahillane's claim of increased chronic pain

18   after the accident, did you form a degree to a

19   reasonable -- did you form an opinion to a reasonable degree

20   of medical certainty about her complaints of chronic pain

21   increasing?

22   A.  I'm not sure exactly what you're referring to.  But she

23   certainly had chronic pain complaints way before the

24   accident, and I've already described what pain complaints she

25   was describing on my exam.

1  Q.  Did the motor vehicle accident -- did you form an opinion

2   to a reasonable degree of medical certainty whether the motor

3   vehicle accident on -- in January of 2020 caused an increase

4   as to her chronic pain complaints, as opposed to those pain

5   complaints that resulted --

6  A.  Yeah --

7  Q.  -- from the accident?

8  A.  Yeah, not that I could determine.  And you could also look

9   at it from an objective standpoint.  There didn't seem to be

10   any increase in pain medicine.  There was not -- I did not

11   see any documentation of any referrals to specialists for

12   chronic pain.  I did not see a -- an escalation of medication

13   use that would subjectively show that.

14  Q.  And there's a -- so let me just babystep through.  Chronic

15   complaints of pain:  What does "chronic complaint" mean?

16  A.  I mean, 100 -- 100,000 people in the United States have

17   chronic pain.  It just means that you have an area of the

18   body that has persistent pain.

19  Q.  And is there something -- a term in medicine where you

20   talk about baseline levels?

21  A.  Yes.

22  Q.  And what are baseline levels, in this case, of pain, for

23   example?

24  A.  It would be, you know, your -- what your usual pain levels

25   are for whatever, you know, part of the body that is causing

1    you that discomfort.

2    Q.  And on your evaluation and examination of Ms. Cahillane,

3     where did she appear, in terms of her baseline level of

4     chronic pain, during your examination in April?

5    A.  Right.  I mean, a lot of the areas that she had complained

6     of pain before, she no longer had.  And I've already said the

7     two areas that I listed for pain, in terms of her low back

8     and her knee.

9    Q.  Was she at baseline for her preaccident levels?

10   A.  Well, she was at the baseline treatment.  Again, there is

11    different complaints throughout her history.  So it's hard

12    to -- if you're asking about her back pain, it appears that

13    the back pain was similar to what she was describing in the

14    past, yes.

15   Q.  And when you say complaints of varying pain throughout her

16    history, are those considered episodic complaints of pain?

17   A.  Yes.

18   Q.  So talking about chronic pain, had her chronic pain

19    baseline remained the same or increased after the motor

20    vehicle accident?

21   A.  Well, it certainly didn't increase.  But, again, you know,

22    her chronic pain started with the reduction -- the

23    mammoplasty.  And it evolved to chronic joint pains of

24    various sorts, neck pain and low back pain.

25   Q.  At the time of your examination in April of 2025, had

1    Ms. Cahillane improved from her baseline, in some respects?

2    A.  There appears to have been some improvement, yes.

3    Q.  In summary, Dr. Michna, I think you testified that

4    Ms. Cahillane suffered injuries to her lower left leg and

5    shoulder in the motor vehicle accident; is that correct?

6    A.  That's correct.

7    Q.  At the time of your examination of Ms. Cahillane, did

8    those injuries appear to have healed?

9    A.  Yes.

10   Q.  Did those injuries require any further interventions at

11   the time of your examination?

12   A.  No.

13   Q.  To a reasonable degree of medical certainty, did you form

14   an opinion about plaintiff's other complaints of -- other

15   complaints of pain?

16   A.  Yes.

17   Q.  And did you just testify to that opinion?

18   A.  Yes.

19   Q.  Were those preexisting complaints of pain caused by the

20   motor vehicle accident?

21   A.  No.

22   Q.  Were they exacerbated by the accident?

23   A.  No.

24   Q.  Have you formed an opinion about the injuries

25   Ms. Cahillane sustained in the motor vehicle accident as it

 1    relates to the limitation of her activity level?

 2   A.  Yes.

 3   Q.  And what is that opinion?

 4   A.  I don't see any limitations based on her recovery from

 5    those injuries.

 6            ATTORNEY PIEMONTE:  May I have a moment, your Honor?

 7            THE COURT:  Mm-hmm.

 8            ATTORNEY PIEMONTE:  Nothing further.

 9            THE COURT:  All right.  Thank you.

10            ATTORNEY PIEMONTE:  Thank you.

11            THE COURT:  All set?

12            ATTORNEY MANGINI:  Your Honor, did you want to take

13    the afternoon recess -- or the mid-morning recess?

14            THE COURT:  I mean, we can take a break now, yeah.

15    That's fine.

16            ATTORNEY MANGINI:  Okay.

17            THE COURT:  Okay.  Thanks for suggesting it.

18            THE CLERK:  All rise.

19    (Recess taken at 11:17 a.m. until 11:37 a.m.)

20            THE CLERK:  Court is back on record.

21            THE COURT:  Whenever you're ready.

22            ATTORNEY MANGINI:  Thank you, your Honor.

23                         CROSS-EXAMINATION

24    BY ATTORNEY MANGINI:

25   Q.  Good morning, sir.

1    A.  Good morning.

2    Q.  And it is Dr. Michna, correct?  Or is it Mick-na?

3    A.  It is Michna, but I answer to anything.

4    Q.  Okay.  I'll try my best to call you Dr. Michna.

5    A.  You can call me whatever you'd like.

6    Q.  So, Dr. Michna, the defense in this case provided you with

7     Ms. Cahillane's medical treatment records -- both before

8     collision and post-collision -- correct?

9    A.  That's correct, yes.

10    Q.  And you would agree with me that it is important that

11     you're provided with all of the relevant records for

12     this -- for the case that you're reviewing?

13    A.  Sure.

14    Q.  And did you review all of those records that you went over

15     during direct with defense counsel -- did you review them in

16     their entirety?

17    A.  I would think, for the most part; I went through them,

18     yes.  Obviously, a lot of the stuff is not relevant, like

19     charts and stuff, like medica --

20    Q.  There's a lot of sick visits and --

21    A.  There's a lot of stuff that's not relevant, but...

22    Q.  But you did review the relevant -- all of the relevant

23     prior records, correct?

24    A.  I believe so, yes.

25    Q.  And in reviewing those records and examining

1    Ms. Cahillane -- which I think you touched about on this in

2    direct -- but you did learn that Ms. Cahillane suffered from

3    chronic pain?

4    A.  Yes.  She had chronic pain from what I believe was the

5    reduction mammoplasty.  That's what started it.  And then she

6    developed various joint pains and back pains after that, yes.

7    Q.  But as far as the records are concerned, the chronic pain

8    is related specifically to the chest wall pain, correct?

9    A.  I believe that's where it was first diagnosed, yeah.  And

10   in the records, yes.  I'm sorry.

11   Q.  Thank you.

12            ATTORNEY MANGINI:  Can you bring up Joint

13   Exhibit 10, page 329.  Can you just scroll up to the first

14   page, 320, for completeness.

15   BY ATTORNEY MANGINI:

16   Q.  Dr. Michna, I'm showing you Plaintiff's Joint Exhibit 10,

17   which is a medical record.  And you would agree that says it

18   is from Dr. John Bedford's office?

19   A.  Yes.

20   Q.  And that's Ms. Cahillane's primary care doctor?

21   A.  Yes.

22   Q.  And this record is from September 8th, 2016; is that

23   correct?

24   A.  That's correct.

25   Q.  Now, looking at the first page.  There's a problem list

1    listed on this visit, correct?

2    A.  Yes.

3    Q.  And do you see anywhere in that problem list any reference

4     to degenerative disk disease?

5    A.  No.

6    Q.  Do you see any reference on the problem list to lumbar

7     facet pain or arthropathy?

8    A.  On this list, no.

9    Q.  Do you see anything on the problem list related to neck

10    pain?

11   A.  What you're showing me, no.

12   Q.  What about left knee pain?

13   A.  No.

14   Q.  Anything on here for arthritis?

15   A.  No.

16           ATTORNEY MANGINI:  All right.  Can you scroll down a

17    page.

18   BY ATTORNEY MANGINI:

19   Q.  But there is, on the next page -- there is chronic pain

20    listed, correct?

21   A.  That's correct.

22   Q.  All right.  It says it was diagnosed as of December 18th,

23    2009?

24   A.  Correct.

25   Q.  And according to that note -- the onset date, again,

1   December 18th, 2009 and "The mapped diagnosis code was

2   chronic chest wall pain after mammoplasty"?

3   A.   That's correct, yes.

4   Q.   So there's no mention, in at least the 2016 record,

5   chronic pain, of anything to do with Ms. Cahillane's neck,

6   back, left knee, or joints; fair to say?

7   A.   On the list you showed me, yes, that's correct.

8   Q.   Thank you.

9        And she's -- the Vicodin or the hydrocodone that she's

10   provided -- that's for the chronic pain prior?

11   A.   It was started because of that, yes.

12   Q.   Okay.  It was started because of that.  And then on

13   direct, you testified that you think that it might have

14   progressed to have to do with the various joint pains; did I

15   hear that correctly?

16   A.   I mean, you're giving a pain med, and she has other pain

17   complaints.  So by intuition or by rationale that it's,

18   obviously, going to help treat all of those pain complaints,

19   yes.

20   Q.   That's an assumption on your part, though?

21   A.   Yes.  I mean, you can't tease out when you -- when you're

22   taking an opioid and you have pain, you can't tease out what

23   it's being therapeutically effective for.

24   Q.   And so, as you sit here today, there's no way for you to

25   tell when Dr. Bedford decided to start prescribing Vicodin

1    for this alleged joint neck and back pain that Margaret

2    Cahillane had prior to the motor vehicle collision; is that

3    fair?

4    A.  Unless we go through all of the records and see if the

5    chest wall pain was no longer an active problem, yeah.

6    Q.  And did you see that when you went through the prior

7    records?

8    A.  I don't remember.

9    Q.  Now, in the review of Ms. Cahillane's prior medical

10   records -- and I understand you were provided about ten

11   years' worth of prior records, but I want to limit it from

12   January 1st, 2015 to January 15th, 2020, so the day right

13   before the accident.  So five years.  Okay?

14   A.  Okay.

15   Q.  Did you see any reference in those five years of prior

16   medical records to diagnostics from Ms. Cahillane's left

17   shoulder?

18   A.  Again, I don't have the records in front of me.  I don't

19   have photographic memory.  But I don't have any specific

20   memory of it, but...

21   Q.  Let me ask you this:  If you had seen references to those

22   diagnostics, would those have been in your report that you

23   authored?

24   A.  Most likely, yes, if I --

25   Q.  And do you still have your report in front of you?

1   A.   Yeah.

2   Q.   Do you want to go through your report to see if there were

3    any diagnostics that you saw related to Ms. Cahillane's left

4    shoulder from January 1st?

5   A.   Yeah.   There's nothing that I listed.

6   Q.   Did you list any prior diagnostics for her left bicep for

7    that time period?

8   A.   No.

9   Q.   What about her left fibula?

10  A.   No.

11  Q.   Her hip, left hip?

12  A.   There was nothing -- no hip complaints, I don't believe,

13   until after the accident.

14  Q.   Okay.   Now, there was a diagnostic -- or strike that.

15       In November of 2019, Ms. Cahillane's primary care doctor

16   referred her for X-rays of her neck and her left knee,

17   correct?

18  A.   I believe there was X-rays, yes.

19  Q.   Did you actually see the X-rays?   Or did you just see the

20   referral?

21  A.   Just the report.

22  Q.   Fair to say you haven't actually -- there are no X-rays --

23   at least that we've seen or that you've seen -- from after

24   that November, 2019 visit but before the car accident?

25  A.   Again, I didn't look at any actual radiographs.   I just

1  saw the reports.

2  Q.  During that same time period -- again, the five years

3   before the motor vehicle collision -- did you see any

4   referrals to physical therapy for Ms. Cahillane for any part

5   of her body?

6  A.  I believe so, yes; I think.

7  Q.  What part of her body?

8  A.  I don't remember.  But I know that there was several

9   requests for physical therapy.  But I'm not sure she actually

10  went.

11 Q.  And those physical therapy referrals were for before the

12  motor vehicle collision?

13 A.  I believe so, from my memory, yeah.

14 Q.  But, again, would that have been something that you would

15  have noted as significant in your record -- in your report?

16 A.  Not necessarily, no.

17 Q.  Okay.  Do you know which body part she was referred to

18  for --

19 A.  I don't remember.  I just -- I have a memory that she

20  would -- there was some documentation that she was referred

21  for therapy.  She had various complaints of pain throughout

22  the prior few years of -- you know, it was her neck, her low

23  back, her shoulder.  So it's hard for me to remember exactly

24  what relationship with her was with that.

25 Q.  Okay.  So your opinion in this case is that

1    Ms. Cahillane's back and left knee pain are actually

2    preexisting chronic conditions that were not affected by the

3    motor vehicle collision; is that correct?

4    A.   The left knee pain?

5    Q.   Left knee and the lower back.

6    A.   Well, she had the left knee pain.  But there was a new

7    disk -- meniscus tear that occurred postsurgery --

8    postaccident.

9    Q.   Okay.

10   A.   And that was -- I think that's the reason for the current

11   pain that she was having there.  But she had degenerative

12   disease of the knee on radiographs prior to the accident.

13   Q.   As you sit here today, do you know if you saw any prior

14   physical therapy referrals, visits, or anything related to

15   physical therapy for either Ms. Cahillane's low back or left

16   knee before the motor vehicle collision?

17   A.   Again, I don't know specifically.  I do remember there

18   were physical therapy referrals.  What they -- what the

19   complaint was at the time, I don't remember.

20   Q.   What about any referrals to chiropractic treatment before

21   the motor vehicle collision?

22   A.   I have -- I don't remember if there was.

23   Q.   Any referrals to pain management before the collision?

24   A.   No.

25   Q.   Any referrals to an orthopedic before the collision?

1  A.  I'm not sure.

2  Q.  What about any referrals for injections or other types of

3   pain management before the collision?

4  A.  Again, I don't remember that I saw that, no.

5  Q.  And with your review of the prior medical records, did you

6   see any discussion regarding surgery for Margaret Cahillane

7   for any parts of the body that she alleges were injured in

8   this motor vehicle collision?

9  A.  You mean from the -- again, I'm -- you have to be more

10   specific.  I think that she had seen orthopedics prior to the

11   accident.  I don't remember what the issue was, though.

12  Q.  Do you know for which body part?

13  A.  No.  I don't remember.

14  Q.  And if it was for a relevant body part, would that have

15   been important for you to put in your report, if she had seen

16   an orthopedic?

17  A.  Well, my report just summarizes, basically, you know, my

18   exam and the -- the highlights of the history, so...

19  Q.  Right.  I understand that it highlights --

20  A.  But seeing an orthopedic, if there was an intervention, I

21   should have put it in, yes.

22  Q.  It should be in your report, correct?

23  A.  The -- if there was an intervention.  If surgery was

24   performed.

25  Q.  And in your report, is there any reference to prior

1   surgeries to any of Ms. Cahillane's alleged injuries from

2   this motor vehicle collision?

3   A.  You have to be more specific.  Are we referring to the

4   shoulder injury or the fibula injury?

5   Q.  Well, let's take it one by one.

6       And did you see any prior surgery recommendations or

7   surgical procedures to Ms. Cahillane's left shoulder prior to

8   the motor vehicle collision?

9   A.  No.

10  Q.  What about to her left knee?

11  A.  No.

12  Q.  What about to her low back?

13  A.  No.  There was no surgeries on her low back.

14  Q.  Neck?

15  A.  No surgeries on her neck.

16  Q.  Hip?

17  A.  No surgeries on her hip.

18  Q.  As you sit here today, can you tell us whether or not, in

19  the five years prior to the collision -- whether or not

20  Ms. Cahillane was actively treating with any other provider

21  for her low back before the collision?

22  A.  I have no memory of it.

23  Q.  What about her left knee?

24  A.  Again, I -- I don't know.  I don't remember.

25  Q.  Now, you also -- we talked about, on direct, that there

1   was a physical examination that you conducted of

2    Ms. Cahillane?

3   A.   Yes.

4   Q.   Her appointment started at 4:30?

5   A.   Yes.

6   Q.   And it ended at around 4:00 -- 5:00?

7   A.   A little after 5:00, yeah.

8   Q.   Was there also a fire alarm in the middle of that

9    appointment, right before it started?

10  A.   It was before.  But it wasn't during the appointment, no.

11  Q.   And after your record review and physical examination of

12   Margaret Cahillane, you concede that she was injured as a

13   result of the January 16th, 2020 motor vehicle collision,

14   correct?

15  A.   She, obviously, had the fibula fracture, and she had the

16   rotator cuff tear of her left shoulder that had to be

17   repaired.

18  Q.   And I think you also, in your report, reference that you

19   believe she did have some temporary neck pain as a result of

20   this collision?

21  A.   On her visit with her primary care, she complained of both

22   neck, low back, and the -- the lower leg pain and the

23   shoulder pain.

24  Q.   Do you know how long Ms. Cahillane's neck pain lasted from

25   the motor vehicle collision?

1    A.  I don't know exactly.

2    Q.  And I think you testified, but just to confirm, you also

3     agree that the left shoulder rotator cuff tear is related to

4     the collision, correct?

5    A.  I think it is pretty evident that she -- the MRI revealed

6     that there was a tear there.

7    Q.  Okay.  And is it also your opinion that the failure of the

8     tendinosis of her bicep is related to the collision?  The

9     Popeye's deformity that she has?

10   A.  Again, I'm not an orthopedic surgeon, but I would assume

11    so, yes.

12   Q.  And in your opinion, was all of the treatment that

13    Ms. Cahillane received for those injuries that we just

14    discussed -- was the treatment itself reasonable and

15    necessary?

16   A.  Well, there was no treatment for the fibula fracture, but

17    for the shoulder, yes.

18   Q.  But it was reasonable for her to go and see the orthopedic

19    care doctor?

20   A.  Oh.  Yes, of course.

21   Q.  And I understand that, in terms of the other injuries that

22    Margaret Cahillane is alleging were injured in this motor

23    vehicle collision, it is your opinion that they're not

24    related.  But do you agree that the treatment itself that she

25    received -- that the treatment was reasonable and necessary?

```
 1              ATTORNEY PIEMONTE:  Objection.

 2              THE COURT:  Overruled.

 3   A.  Could you be more specific in --

 4              ATTORNEY PIEMONTE:  Your Honor, if I may?

 5              THE COURT:  Sure.  Go ahead.

 6              ATTORNEY PIEMONTE:  His expertise is in pain.  And

 7   so these questions may be more appropriate for a different

 8   expert, in terms of orthopedic treatment, et cetera.

 9              THE COURT:  All right.  I'm going to --

10              You're going to rephrase.

11              I'm going to overrule the objection.

12              But if you want to rephrase, go right ahead.

13              And, obviously, this witness understands -- and I

14   have no doubt will say so -- if he can't give an opinion.

15   BY ATTORNEY MANGINI:

16   Q.  So let's focus on the left knee.  So in this case,

17    Ms. Cahillane had surgery to her left knee, and then -- I

18    think you also mentioned -- she's had some injections --

19    steroid injections, and also the viscosupplement injections,

20    correct?

21   A.  That's correct, yes.

22   Q.  She had some physical therapy in there as well, I think

23    it said?

24   A.  I believe so, yes.

25   Q.  The treatment itself -- not whether or not it is related
```

 1    to the motor vehicle collision, but the treatment itself --

 2    was the treatment reasonable for the injury?

 3              ATTORNEY PIEMONTE:  I'm just going to object as to

 4    relevance.

 5              THE COURT:  All right.  If you can answer.

 6              Overruled.

 7              With the caveat that:  If you can answer, given your

 8    training and experience.

 9    A.  Again, I mean, I would defer to the orthopedic surgeon, in

10    terms of what the actual treatment is.  But for degenerative

11    disease of the knee, steroids and viscosupplements are very

12    common interventions.

13    BY ATTORNEY MANGINI:

14    Q.  And so in terms of her low back, Ms. Cahillane had some

15    physical therapy, chiropractic treatment, and then she also

16    had some injections to her low -- to her sacroiliac, back --

17    A.  It was the sacroiliac, yeah.

18    Q.  And that treatment itself -- are those treatments

19    appropriate to treat low back or sacroiliac pain?

20    A.  Well, it's -- "low back" is a generalized term.  And,

21    again, on my exam she didn't have sacroiliac pain.  But if

22    the orthopod and the physiatrist felt that the pain

23    generator, when they saw, her was in the sacroiliac, then an

24    injection in those joints would be reasonable.

25    Q.  Okay.  And we talked earlier that you did author a report

1    in this case.  You did an initial report in 2024, and then

2    you did an addendum after you conducted the independent

3    medical exam, correct?

4    A.  That's correct, yes.

5    Q.  And you would agree with me that your report should

6    contain accurate information?

7    A.  I'm sorry?

8    Q.  You would agree that your reports should contain accurate

9    information?

10   A.  Yes.

11   Q.  And would you also agree that your reports should contain

12   complete information?  In other words, you can't just

13   cherry-pick from certain facts from certain records, correct?

14   A.  Well, I think when you're writing a report, you put

15   relevance that you think in terms to tell the story of what

16   happened.  So you certainly don't include everything because

17   most of it's really not pertinent.

18   Q.  Sure.  So you don't need to include, like we talked about,

19   sick visits, stuff like that.  But in terms of the specific

20   body parts that you're writing a report on, you need to

21   include all of the information that you --

22   A.  I think you have to get a general trend.  Just because

23   somebody complained of some ache or pain on a visit, I

24   necessarily wouldn't put that in my report unless there was a

25   continuing issue with it or there was something pertinent

1    about -- that was shown in terms of imaging or findings or

2    something like that.

3        People complain of pain.  People complain about a lot of

4    things on different visits.  And unless there's a consistent

5    issue that is current to make a determination of what's

6    happening, not all of that is relevant.

7    Q.  And so just because a patient might come in and have, you

8     know, complaints of pain here or there -- I just want to make

9     sure I understand what you're saying -- you would agree that

10    that doesn't mean that that is a chronic condition, correct?

11   A.  Well, I mean, if you have a complaint and you have imaging

12    showing a degeneration, that's a chronic problem.  That's not

13    going to go away.

14   Q.  Okay.  But if someone just comes in --

15   A.  It doesn't mean -- I'm sorry.  It doesn't mean -- you can

16    have back problems and significant disease, but all of us

17    that have had back problems know that it waxes and wanes with

18    time, right?  So you become symptomatic and then you're

19    asymptomatic.  Five years later, you might be symptomatic

20    again, but the disease process is continuing; you understand?

21   Q.  So pain fluctuates?  Pain levels fluctuate?

22   A.  It is not the pain levels.  It's the -- whether you're

23    symptomatic or asymptomatic.  So we could take an MRI of

24    anybody on the street and they could have severe degenerative

25    disease but never have complained of back pain or leg pain or

1    a pain or a disk herniation; that's just not symptomatic.  So

2    the disease is there, but the patient doesn't report any

3    symptoms from the disease.

4    Q.  I think I understand what you're saying.  But just to

5     clarify --

6    A.  I just want to be specific because the disease doesn't go

7     away.

8    Q.  Right.

9    A.  Arthritis doesn't go away.  Degeneration of joints don't

10   go away.  But the disease process, with time, can wax and

11   wane in terms of symptoms --

12   Q.  Understood.

13   A.  -- and interference with your life, in other words.

14   Q.  Understood.  So let me just try to break that down a

15    little bit.

16       A person can have a preexisting condition, such as

17    arthritis or degeneration, that is asymptomatic or otherwise

18    they don't have symptoms from it for a period of time,

19    correct?

20   A.  That is correct.

21   Q.  Would you agree that a trauma, such as a motor vehicle

22    crash, can cause an asymptomatic preexisting condition to

23    then become symptomatic?

24   A.  It could change.  Like, I would equate to the example I

25    gave with back pain.  So say there's a herniated disk and

1    it's pushing on a nerve, but the patient is not symptomatic.

2    An event can happen that could make that become symptomatic.

3    Maybe not change the organic nature of what's going on, but

4    it could be symptomatic.  And it also could happen just

5    waking up one morning, you know.  So, yes.

6    Q.   So there's an event -- like a car crash -- that could

7     cause someone's preexisting arthritis, which may be

8     asymptomatic -- and then you have an event, and then it

9     becomes symptomatic?

10   A.   Yeah.  More -- more related to -- you know, not

11   necessarily just -- more like sprains and strains that could

12   occur afterwards or if you have a change in the anatomy.

13       I want to be very specific because, say, you could have a

14   back problem with a disk and, when you have an accident, that

15   disk could herniate, because of whatever biomechanical

16   stresses, and become symptomatic at that point.

17       And if you strain any joint, obviously, after an injury,

18   you can have pain in that joint from not only the preexisting

19   but with -- but also strains and sprains of the ligaments, et

20   cetera.

21   Q.   Do you have your report in front of you --

22   A.   I do.  Thank you.

23   Q.   -- the amended report?

24   A.   Mm-hmm.

25   Q.   I think you testified earlier that you believe -- or that

1      it is your opinion that Margaret had prior back, neck,

2      shoulder, knee, and joint pain, prior to this motor vehicle

3      collision; is that correct?

4   A.  Well, I'm just basing it on the report said -- her primary

5      care -- that she complained of all of this.  And the imaging

6      -- and the relevant imaging that was done at that time.

7   Q.  Okay.  So your opinion is based on the prior medical

8      records as to what her preexisting level of health was,

9      correct?

10  A.  Yeah.  There's -- that's the only way -- I didn't know her

11     back those days, so I, obviously, have to rely on the record.

12  Q.  And if you look at the "prior medical history" that you

13     listed in your report -- I think it starts at the bottom of

14     page 2 and goes on to page -- do you see that?

15  A.  Yup.  Got it.

16  Q.  If you look at that, you would agree with me that there's

17     no reference in that prior medical history section to back

18     pain?

19  A.  Yeah.

20  Q.  There's no reference to neck pain?

21  A.  Right.

22  Q.  There's no reference to left knee pain?

23  A.  Right.

24  Q.  There's no reference to joint pain?

25  A.  That's correct.

1    Q.  No reference to degenerative disk disease or arthritis?

2    A.  That's correct.  These were her reports, not -- when I put

3    this in here, it's what she told me.  So it wasn't by -- my

4    report with the IME portion, where I described that, was

5    based on her report to me.  So including the medicines, I

6    reported what she actually told me.  I didn't go back to the

7    record to see what she was actually on.

8    Q.  So you did not go back to compare that to the prior

9     records?

10   A.  I looked at it.  But I'm saying, when I prepared this

11   report, the IME portion, that was taken from

12   her -- discussion with her.

13   Q.  You also stated on direct that your primary care

14    record that -- I'm sorry -- that Ms. Cahillane's primary care

15    records seemed to suggest that she had joint neck and low

16    back pain prior to the motor vehicle crash, correct?

17   A.  That's correct, yes.

18   Q.  Can you tell us when she last complained of back pain

19    prior to the motor vehicle collision?

20   A.  I don't know.

21   Q.  Do you know how many times she complained of lower back

22    pain prior to the motor vehicle collision?

23   A.  I don't have a number, no.

24   Q.  Would that have been something that you should have put in

25    your report so, that way, we know when her last complaints of

1    prior back pain were?

2    A.  Well, I said that she had prior reports of back pain.  I

3    didn't document the frequency or the intensity of those

4    reports.

5    Q.  So as you sit here today, you cannot tell us the last time

6    Margaret Cahillane had low back pain prior to the

7    January 1st -- I'm sorry -- January 16th, 2020 motor vehicle

8    collision?

9    A.  Not unless you show me the medical records.

10   Q.  Do you remember reviewing a medical record from January

11   12th -- I'm sorry -- July of 2012?

12   A.  I might have.  I don't have -- I can't remember thousands

13   of pages of records, so...  But if you show it to me, I'll be

14   glad to look at it.

15           ATTORNEY MANGINI:  It is Joint Exhibit 10, 771.

16   BY ATTORNEY MANGINI:

17   Q.  And so can you see that on your screen, Doctor?

18   A.  Yes.

19   Q.  And in this case, the diagnosis is -- I'm assuming "B"

20   stands for "bilateral."  Is that a fair assumption?

21   "Bilateral low back," and then, it looks like "left

22   cervical"?

23   A.  That's correct.

24           THE CLERK:  I'm sorry.  What exhibit is this?

25           ATTORNEY MANGINI:  Joint Exhibit 10.

1          THE CLERK:  Thank you.

2    BY ATTORNEY MANGINI:

3    Q.  And this an evaluation date from June 1st, 2012, correct?

4    A.  It says Discharge Summary.

5    Q.  Okay.  But do you see where it says Evaluation Date right

6     after Diagnosis?

7    A.  Oh, right.  I'm sorry.

8    Q.  And looking at this record, it looks like this is a record

9     to Dr. Bedford, correct?

10   A.  (Nonverbal response.)

11   Q.  And it reports that Margaret has a --

12          ATTORNEY MORGAN:  Sorry.  Our screens are out.  I

13   don't know if it's possible to get it back up on our screen.

14   If it can't, we can look over there.  It is just a little

15   hard to look away, that's all.

16          THE CLERK:  Is it on now?

17          ATTORNEY MORGAN:  Yes.  Thank you.

18   BY ATTORNEY MANGINI:

19   Q.  I just want to make sure.  It is still on your screen,

20    correct?

21   A.  It is, yes.

22   Q.  All right.  So this was a record from Baystate Rehab to

23    Dr. Bedford regarding Margaret's bilateral low back and left

24    cervical pain, correct?

25   A.  Mm-hmm.

1    ATTORNEY MANGINI:  Can you scroll down, Hayley.

2    BY ATTORNEY MANGINI:

3    Q.  And I know it is a little bit difficult to read, but it

4     says, "On patient's last visit, eval only, provided with a

5     home exercise program for stretching and initial lumbar

6     stretch."

7    A.  Right.

8    Q.  "Patient did not" -- did I read that correctly?

9    A.  That's correct.

10   Q.  "Patient did not follow up with appointments and when she

11    was called," she "reported a decrease in symptoms during" --

12   A.  "Doing."  "Doing."

13   Q.  Is that correct?

14   A.  It says "doing."  "Doing program."

15   Q.  Oh, I'm sorry.  "Doing program."  Is that correct?

16   A.  Yes.

17   Q.  All right.  Do you remember seeing this record in your

18    review of the records?

19   A.  Not specifically.  But, as I said, I said that I saw

20    physical therapy records of --

21   Q.  And do you have any reason to believe that there's any

22    additional records related to Ms. Cahillane's low back pain

23    after this record but before the motor vehicle collision?

24   A.  Again, I don't -- I don't have a specific memory.

25    ATTORNEY MANGINI:  You can take it down.

1   BY ATTORNEY MANGINI:

2   Q.  I'd like to turn now to some specific injuries that you

3    talked about on direct.  Okay?

4   A.  Okay.

5   Q.  And I'd like to start with the left knee.  And I just want

6    to confirm that when you saw Margaret in March of this year,

7    she continued to have some issues with her left knee that

8    were corroborated by your physical examination, correct?

9   A.  Yes.  As she had pain on the medial aspect or the inner

10    aspect of her left knee.

11  Q.  And I just want to clarify, because I don't know if I

12    heard you correctly or not, but on direct did you testify

13    that Margaret had a prior left knee surgery before the motor

14    vehicle collision?

15  A.  I don't think I did.  I'm sorry.  If I did, I don't

16    believe that's correct.

17  Q.  Okay.  We can agree there was no prior left knee surgery

18    before the motor vehicle collision?

19  A.  My memory is such that there wasn't, yes.

20  Q.  Okay.  Excellent.

21      In your report, you reference that Margaret Cahillane had

22    complained of left knee pain prior to the motor vehicle

23    collision, correct?

24  A.  She complained of knee pain.  I don't remember which knee

25    it was, but, yes, she did complain of knee pain at one point.

1  Q.  Well, you would agree if she complained of right knee

2   pain, that would not be really relevant to this entire

3   conversation, correct?

4  A.  Not as to her left.  But, again, I don't remember exactly.

5  Q.  Okay.  And you also state --

6  A.  I believe it was the left, though, yes.

7  Q.  You also stated that she had an MRI revealing degenerative

8   joint disease and arthritis.  Is that in her left knee?

9  A.  She had an -- degenerative -- was it the knee or the low

10  back that we're referring to?  I'm not sure what you're

11  referencing.

12  Q.  Well, I think in your report you were referencing left

13   knee.

14  A.  All right.  Well, if you just point to where it was, I

15  can...

16  Q.  Yup.  I think it is on page --

17  A.  Oh, yeah, that's true.  The left knee, that's correct.

18  Q.  All right.  That MRI that you're referencing, is that an

19   MRI that happened before the motor vehicle collision or after

20   the motor vehicle collision?

21  A.  Again, I didn't note it there, so I don't remember when it

22   was.

23  Q.  So you have no way of knowing, as you sit here today,

24   whether or not there are any prior MRIs of Ms. Cahillane's

25   left knee that showed degeneration or arthritis?

1    A.  Other than that MRI that I documented, I don't remember

2    any, no.  I think she did have X-rays, though.

3    Q.  As you sit here today, there's -- strike that.

4       One of the injuries that Margaret Cahillane alleges is a

5    left meniscus knee tear -- left knee meniscus tear?

6    A.  Mm-hmm.

7    Q.  As you sit here today, do you know when that tear

8    occurred?

9    A.  Exactly, no.

10   Q.  Do you know if it occurred before the motor vehicle

11   collision or after the motor vehicle collision?

12   A.  If she didn't complain of it prior and the MRI was done

13   well after, so we have to go by the evidence we have, we

14   really can't make that total determination.

15   Q.  And there was one prior visit, prior to the motor vehicle

16   collision, where Ms. Cahillane complained of left knee pain,

17   correct?

18   A.  Yes.

19   Q.  And that was November 4th, 2019?

20   A.  The exact date, I don't know.  But it was prior to the

21   accident.

22            ATTORNEY MANGINI:  Can you bring up Joint

23   Exhibit 10, 219.

24            And just for the record, this is Joint Exhibit 10.

25

1  BY ATTORNEY MANGINI:

2  Q.  Dr. Michna, did that show up on your screen?

3  A.  Yes, got it.

4  Q.  All right.  So looking at this, this is -- again, it is

5   another medical record from Dr. Bedford?

6  A.  Correct.

7  Q.  And it is dated November 4th, 2019?

8  A.  Yes.

9  Q.  And under the History of Present Illness, it states,

10   "Polyarthritis," and it states, "The symptoms are reported as

11   being mild," correct?

12  A.  Yes.

13  Q.  And she has -- she's complaining of hands and neck being

14   sore, right?

15  A.  That's correct.

16  Q.  And then there's a reference to her left knee as also

17   bothering her more; is that fair to say --

18  A.  Correct.

19  Q.  -- that's what the record says?

20      Do you know specifically what her complaints were in that

21   visit related to her left knee?

22  A.  Unfortunately, Dr. Bedford wasn't very specific in

23   describing the location of the pain.

24  Q.  Do you know what her pain level in her left knee was at

25   that visit?

1    A.   Again, he did not document that, to my best understanding.

2     Unless you can show me otherwise.

3    Q.   Do you know if she was having difficulty with stairs

4     because of her left knee at that visit?

5    A.   I -- again, if you show me the complete record, I can tell

6     you.

7    Q.   Sure.

8    A.   But if it is not there, it's not there.

9            ATTORNEY MANGINI:   Okay.   We -- Hayley, can you show

10    the second page?

11   BY ATTORNEY MANGINI:

12   Q.   So it looks like the second page is really just a list of

13    her medication?

14   A.   Correct.

15   Q.   So there's a Review of Symptoms [sic].   Does that suggest

16    to you at all what either her pain level was or what her

17    symptoms were with her left knee?

18   A.   No.   Again, unfortunately, the primary care did not record

19    that.

20   Q.   And looking at this record, is there any way for you to

21    tell if she had a crunching sound in her left knee at this

22    visit?

23   A.   No.

24   Q.   Is there any way for you to tell if her left -- if she

25    felt like her left knee was buckling at this visit?

1    A.  All we have is the written report.  So if it's not there,

2    there's no way I can possibly do that.

3    Q.  At this November 2019 visit -- and, again, I can scroll to

4    the third page, if you want, too -- but was there any

5    indication that Dr. Bedford referred Ms. Cahillane to

6    physical therapy for her left knee?

7    A.  Well, if you want me to look at it, you should show me the

8    whole.

9    Q.  I do have a physical copy of the actual visit record, if

10   it is easier --

11   A.  Okay.  Well, I mean, I see his assessment and plan.  He

12   doesn't even list that as a problem there, so...

13   Q.  And there's no --

14   A.  He just says "Check X-rays."  That's all.  So he had sent

15   her for X-rays.

16   Q.  So no referral for physical therapy?

17   A.  Not that's listed here, no.

18   Q.  No referral to an orthopedic?

19   A.  No.

20   Q.  Nothing in his record that suggests there's some type of

21   meniscus or other ligament injury to her knee?

22   A.  Well, he doesn't have the -- he didn't do any scans, so

23   that's the only way you're going to -- an MRI is the only way

24   you're going to evaluate that.

25              ATTORNEY MANGINI:  You can take that down.

1  BY ATTORNEY MANGINI:

2  Q.  Now, in terms of Margaret's treatment regarding her left

3   knee post-motor vehicle collision, okay?

4  A.  Okay.

5  Q.  You would agree with me that the day after the collision,

6   Margaret went to urgent care complaining of left-side body

7   pain and left leg pain?

8  A.  Yes.  I believe she had -- well, I know from her primary

9   care that she complained of lateral left knee pain and the

10  lower pain in her calf.

11  Q.  Okay.  And at urgent care, she's diagnosed with a

12   contusion of the left knee?

13  A.  That's what -- yeah, that was her diagnosis.

14  Q.  Would you agree with me that a contusion is indicative of

15   a direct impact or blunt force?

16  A.  Well, there's injury to the skin, basically, yes.

17  Something -- something hit that area.

18  Q.  A direct impact to that area?

19  A.  As evidenced by the contusion.

20  Q.  So, in other words, there's some sort of direct impact to

21   Margaret's left knee the day after the motor --

22  A.  There was an injury to the skin that caused it to be a

23   contusion at that area, according to the -- the record.

24  Q.  Three days later, she's at Dr. Bedford's office, also

25   complaining of left knee pain, correct?

1   A.  Yes, yes.

2   Q.  He reaffirms the diagnosis of a contusion?

3   A.  Yeah.  He diagnosed it as contusions also, yes.

4   Q.  And then he refers her to physical therapy at Baystate

5    Rehab?

6   A.  I believe so, yes.

7   Q.  And at Baystate Rehab, she's complaining -- or notes

8    indicate that she has an antalgic gait?  I might have

9    pronounced that incorrectly.

10  A.  Yeah, antalgic gait.

11  Q.  Antalgic gait?

12  A.  Yeah.

13  Q.  So she had that at physical therapy?

14  A.  Yeah.  I mean, that's probably related to the pain that

15   she was suffering in her leg.

16  Q.  Notes at Baystate Rehab from that time period indicate

17   increased symptoms in her left knee?

18  A.  Again, if you pull up the record, I can confirm it.  But I

19   don't -- I don't have photographic memory.  I'm sorry.

20          ATTORNEY MANGINI:  Joint Exhibit 4, page 163.

21  BY ATTORNEY MANGINI:

22  Q.  Okay.  So this is a physical therapy record dated June

23   2nd, 2020, so four months after the collision; is that

24   correct, approximately?

25  A.  A little bit more than that, yeah.

1          ATTORNEY MANGINI:  Hayley, can you scroll down a

2    little bit, please.

3    BY ATTORNEY MANGINI:

4    Q.  All right.  And do you see under Assessment --

5    A.  Mm-hmm.

6    Q.  -- it says, "Patient unable to perform side to side

7     movements while on rockerboard due to increased symptoms in

8     left knee."

9    A.  Yes.

10         ATTORNEY MANGINI:  And if you scroll to page 166 of

11   that same exhibit.

12    BY ATTORNEY MANGINI:

13   Q.  This is a visit from June 16th, 2020, also a physical

14    therapy visit?

15   A.  Yes.

16   Q.  And under Subjective, it states, "Patient reports

17    experiencing significant pain in the left knee and ankle the

18    following day after exercise and after coming to therapy,"

19    correct?

20   A.  Mm-hmm.  Yes.

21         ATTORNEY MANGINI:  You can take that down.  Thank

22    you.

23   BY ATTORNEY MANGINI:

24   Q.  Now, so that's June, and then July 1st, 2020, is when

25    Margaret has her first left shoulder surgery, correct?

1    A.  Again, I don't know the exact date, but, yes.  I know she

2    had surgery around that time.

3    Q.  During that summer?

4    A.  Yeah.

5    Q.  And then in November of 2020, Margaret returns to the

6    Orthopedic Care Center.

7            ATTORNEY MANGINI:  And, Hayley, if you can bring up

8    Joint Exhibit 5, page 42.

9    BY ATTORNEY MANGINI:

10   Q.  So this is date of service November 16th, 2020?

11   A.  Yes.

12   Q.  And this is the Orthopedic Care Center?

13   A.  Mm-hmm.

14   Q.  And she's there for a recheck of her left lower leg.  But

15   if you look under History of Present Illness --

16   A.  Yeah, I see it.

17   Q.  -- it says, "She finds that weightbearing and

18   forceful/repetitive activities are uncomfortable."  Did I

19   read that correctly?

20   A.  Yes.

21   Q.  And "Climbing stairs is particularly uncomfortable and she

22   single steps stairs frequently," correct?

23   A.  Yes.

24   Q.  And would you agree with me that those symptoms -- the

25   difficulty with weightbearing, especially with repetitive

1  activities, and difficulty with stairs -- are also indicative
2   of a meniscus tear?
3  A.  Again, not specifically.  I mean, if you look at their
4   "Impression" -- if you could scroll up a little bit -- "Left
5   lower leg/calf pain swelling.  Healed...fibula...fracture.
6  Deconditioning."
7      So there's no mention of knee.
8  Q.  I'm just asking you, generally, are those symptoms that I
9   just reported also possibly or probably --
10 A.  Again, I'm not an orthopedic surgeon.  I think that would
11  be best to ask an orthopedic surgeon.  I'm sorry.
12 Q.  Now, she returns to the Orthopedic Care Center a few
13  months later in March of 2021.
14          ATTORNEY MANGINI:  Can you scroll to the next page.
15 BY ATTORNEY MANGINI:
16 Q.  And she's here for, this time, a recheck of her left knee,
17  correct?
18 A.  That's what it says, "Recheck."
19 Q.  And at this visit, she's had -- under History of Present
20  Illness, do you see where it says, "She has had some
21  persisting knee region pain proximal to the area of the
22  fibula fracture"?
23 A.  Yes.
24 Q.  And it "started to have crunching of the knee with painful
25  locking recently"?

1  A.  Yes.

2  Q.  And it looks like she had tried to modify her activities,

3   but it doesn't really seem to give her any worthwhile relief?

4  A.  Yes.

5  Q.  Margaret further complained or reported that the knee felt

6   like it was trying to give out, but she hadn't had any falls

7   and she was concerned about stairs?

8  A.  That's correct.

9  Q.  Because "the knee threatens to give way on stairs and

10   if" -- well, because "the knee threatens to give way on

11   stairs," correct?

12  A.  Yeah.  That's what it says, yes.

13  Q.  And then she under --

14         ATTORNEY MANGINI:  You can take that down.  Thank

15   you.

16   BY ATTORNEY MANGINI:

17  Q.  She finally gets an MRI --

18  A.  If you look at the physical exam, though, in terms

19   of -- could we get that back?  I just want to --

20  Q.  Well, no.  That's okay.  They can ask on --

21  A.  All right.  Well, there's no -- he said there was nothing

22   that was related to the joint, I think, but...

23  Q.  He sends her out for an MRI, correct?

24  A.  I don't know.  You took away my image, so...  All I know

25   is I was reading it and there was a statement about that

1    there was no joint -- something where the joint wasn't the

2    cause of the pain or something, not specifically, but...

3    Q.  And so Margaret has an MRI a month or two after that visit

4     in March of 2021?

5    A.  Again, I don't know the exact dates.  You have to show me

6     the records.

7    Q.  Now, she's eventually diagnosed with a lateral meniscus

8     tear, correct?

9    A.  Yes.

10   Q.  And the lateral meniscus, is that on the outside of your

11    knee?

12   A.  Yes.

13   Q.  And is it adjacent to where the fibula is?

14   A.  The knee is above the fibula.  The fibula and the fracture

15    site was much lower than that, so...

16   Q.  And after that MRI, Dr. Rhodes from Orthopedic Care Center

17    recommends that she tries conservative treatment with a knee

18    brace?

19   A.  Again, if you show me the records, I'll read them and

20    endorse what you're saying.

21   Q.  Do you remember reviewing records where it mentions that

22    Margaret was in a knee brace?

23   A.  There's thousands and thousands of records.  I don't

24    remember all of the details.  But if you show me the record,

25    I'll be glad to confirm.

 1          ATTORNEY MANGINI:  Can you pull up Joint Exhibit 5,

 2    page 49, please.

 3    BY ATTORNEY MANGINI:

 4    Q.  So this is an Orthopedic Care Center record from

 5     October 21st of 2021?

 6    A.  Yes.

 7    Q.  And this record -- under Subjective, it states, "Patient

 8     started having left knee pain after a motor vehicle accident

 9     on January 16th, 2020."

10    A.  That's what it says, yes.

11    Q.  And then the next sentence is about the fibula fracture.

12          And then, "She has been seen by Dr. Rhodes for left knee

13     pain and snapping and clicking of the knee."

14          Did I read that correctly?

15    A.  Yes.

16    Q.  And then, "She has a knee brace," which "does not seem to

17     help"?

18    A.  That's correct.

19    Q.  And at this visit they gave her a cortisone injection?

20    A.  It says she has it.  But if there's a procedure note

21     further down, I could --

22    Q.  Under -- okay -- so Procedure?

23    A.  Yes.  So she received a steroid injection, yes.

24    Q.  Correct.  And then she returns to the Orthopedic Care

25     Center on February 28th, 2022.

1          ATTORNEY MANGINI:  Can you scroll to page 57 of that

2    same exhibit.

3    BY ATTORNEY MANGINI:

4    Q.  So this is her follow-up visit.  And in this visit she

5    reports that the cortisone injection provided some relief,

6    but she felt like her knee would go out of place?

7    A.  Just show me where you're -- she does state that

8    she -- yes, I see it.  That's correct.

9          ATTORNEY MANGINI:  Can you scroll down, please.

10   BY ATTORNEY MANGINI:

11   Q.  All right.  So under the Plan and Procedure, it looks like

12   she received another cortisone injection that day?

13   A.  Yes.  There's documentation of a procedure for a steroid

14   injection.

15   Q.  And then is there also a referral to an ortho for a

16   surgical consult at that time?

17   A.  If you -- is it further down or -- I'm not sure where it

18   is.  Maybe up there.  Let's see.  Yeah, he said, will refer

19   to Dr. Wagner.

20   Q.  And I think it says -- yeah.  And she elected to see

21   Dr. Sprague or Sprague?

22   A.  Elected to see Dr. Sprague, yeah.

23          ATTORNEY MANGINI:  Thank you.  You can take that

24   down.

25

1    BY ATTORNEY MANGINI:

2    Q.   And then Margaret was scheduled to have a left knee

3     arthroscopic surgery, but then she had a heart attack,

4     correct?

5    A.   That's my memory, yes.

6    Q.   And so that heart attack, that put a pause on her

7     treatment for about a year while they were dealing with the

8     heart attack issue?

9    A.   Yes.  You don't typically operate on people in the peri-MI

10    period.

11   Q.   So there's nothing that Margaret --

12   A.   Unless there's an emergency, obviously.

13   Q.   There's nothing that Margaret did during -- that she could

14    have done a surgery or anything during that time period -- it

15    would not have been recommended?

16   A.   I would, again, ask an orthopedic surgeon that question.

17   Q.   And you noted on direct that Margaret is receiving the

18    viscosupplementation injections to her knee or has received

19    some?

20   A.   Yes.  She did get a viscosupplementation, yes.

21   Q.   And can you just explain to the Court what that is?

22   A.   There's a material called hyaluronic acid which is a

23    natural component -- presence in the body.  It's a gel-like

24    substance that is proteinaceous.  And the injection purpose

25    is to try to -- when you have degeneration of a knee, lack of

1   cartilage, or deterioration of cartilage and you don't get a

2   great response from a steroid injection, that is an

3   additional option.

4       Again, it is not curative and usually doesn't last more

5   than a few months, in terms of effectiveness, if it works.

6   Q.  Okay.  And you noted in your report that one of the things

7    that you relied upon in your opinion regarding

8   Ms. Cahillane's left knee -- and I think you talked about it

9   on direct -- was on the February 28th, 2022 visit to the

10   Orthopedic Care Center, Margaret noted that she experienced

11   pain in her left knee for over four years?

12  A.  Yes.

13  Q.  Did I understand that correctly?

14  A.  I believe that's what I saw in the record.

15  Q.  And is this the reason that you're -- it's your opinion

16   that Ms. Cahillane's left knee complaints are not related to

17   the motor vehicle collision?

18  A.  What I'm saying is that she had knee pain preexisting

19   prior to the accident.

20  Q.  Right.

21  A.  And that, in my opinion, that it was -- she continued to

22   have degeneration of that knee joint.

23  Q.  Right.  So but according to your opinion, she had it for

24   at least two years prior to the collision?

25  A.  I believe so, yes.

1         ATTORNEY MANGINI:  Can you pull up Joint Exhibit 57

2    at page 50 -- I'm sorry.  Joint Exhibit 5.  Yeah.

3    BY ATTORNEY MANGINI:

4    Q.  This is the February 28th, 2022 note that you referenced

5     in your report.

6    A.  I assume so.

7    Q.  Can you tell me where in this record it says that she's

8     had knee pain for four years prior to -- for four years?

9    A.  I don't know.  I'd have to go through it all.

10   Q.  Take your time.

11   A.  I don't have the whole -- I don't have the whole record,

12    so...

13   Q.  I have actually -- it might be easier.  I have the

14    printout of the record instead of scrolling.

15   A.  Yeah, okay.  That would be great.

16   Q.  Would that be helpful?

17   A.  Yeah.  Thank you.

18         ATTORNEY MANGINI:  May I approach, your Honor?

19         THE COURT:  Sure.

20   BY ATTORNEY MANGINI:

21   Q.  So I'll give you page 57, Joint Exhibit 5, which is the

22    complete record of that February 28th record.

23   A.  Okay.

24         (Witness examined document.)

25   A.  Yeah, I don't see it.  So it could be a mistake, and I

1    could have been referring to something else.

2    Q.  But at least in the record that you specifically referred

3    to, there's no mention that she had left knee --

4    A.  If this is the record I was referring to, it is not in

5    here.

6    Q.  Okay.  And, in fact, that record specifically states that

7    the "Patient started having left knee pain after the motor

8    vehicle accident on January 16th, 2020"?

9    A.  "Started having," that's what it says; "started having

10   knee pain."

11   Q.  And this is consistent with --

12   A.  It doesn't mean that she didn't have knee pain.  The

13   current pain -- you know, I would read it as her current pain

14   started after the accident.

15   Q.  Right.  Her current knee pain that we just talked about

16   that we just went through, that all started post-January

17   16th, 2020?

18   A.  Right.  But it doesn't exclude that she didn't have knee

19   pain prior, obviously.

20   Q.  But the only record that we saw for knee pain prior was

21   the November 4th, 2019 record?

22   A.  Again, I don't have -- I know there was a record that

23   showed knee pain prior.

24   Q.  Okay.  And this February 28th, 2022 record, where she

25   complains of knee pain -- that's consistent with the

1    complaints that she was having and that we went over

2    post-collision; so difficulty with stairs, crunching in her

3    knee, feeling like her knee is going to buckle or give out on

4    her?

5   A.  That's what it says, yeah.

6   Q.  And as far as you're aware, you haven't seen any records

7    that would suggest that she had those symptoms that we just

8    talked about before the motor vehicle collision?

9   A.  She -- the only thing that was documented was knee pain.

10   It wasn't as specific as what you're describing.

11  Q.  Doctor, would you agree with me, then, that even if

12   Margaret Cahillane did have preexisting arthritis in her left

13   knee before to the collision, that the collision itself

14   caused an increase in her symptoms?

15  A.  She had an increase in pain after the accident, yes.

16  Q.  And an increase in her symptoms, correct?

17  A.  Yes.

18  Q.  And as you sit here today, is there any way for you to

19   know whether or not Margaret Cahillane would have had to

20   undergo the treatment that she went to -- underwent on her

21   left knee if there wasn't a motor vehicle collision?

22  A.  I think that's outside of the scope of my -- I would,

23   again, defer to an orthopedic specialist to -- to opine on

24   that.

25  Q.  So you're unable to answer that question?

1   A.  I mean, yeah.  There's too many variables there in terms

2    of, you know -- again, I would defer to an orthopedic surgeon

3    to answer that question.

4   Q.  Could I just take that record back from you?

5   A.  Sure.

6   Q.  Now, I want to switch focus from the left knee and go to

7    the low back.

8   A.  Okay.  Sure.

9   Q.  And I want to show you the November 4th, 2019 record --

10   which is Joint Exhibit 10, page 219 -- again, just talk to

11   you about that.

12          ATTORNEY MANGINI:  Can you pull that up?

13  BY ATTORNEY MANGINI:

14  Q.  Okay.  So this is the same record that we looked at

15   before, but it is Joint Exhibit 10.  And it is the

16   November 4th, 2019 PCP visit date -- immediately before the

17   January 2020 motor vehicle collision -- or January 16th motor

18   vehicle collision.

19  A.  Yes.

20  Q.  Again, if it is easier for you, I have the printout of the

21   full copy of the record.

22  A.  Whichever.  It doesn't matter to me.

23          ATTORNEY MANGINI:  Okay.  May I approach, your

24  Honor?

25          THE COURT:  Sure.

1   BY ATTORNEY MANGINI:

2   Q.  And so just for the record, this goes from 2019 to 2022.

3    I'm just going to ask you a couple questions about that.

4   A.  Sure.

5   Q.  And, again, she's -- Margaret is not complaining of back

6    pain at this visit, at least according to the History of

7    Present Illness?

8   A.  It is not listed, no.

9   Q.  And would you agree with me that in the Problem List from

10   this visit, there's no mention of chronic back pain?

11  A.  Not specifically.  There's just chronic pain listed,

12   that's all.

13  Q.  But that onset date is the 12/18/2009, so that's what we

14   talked about before, correct?

15  A.  That's probably correct, yes.

16  Q.  And in the problem list, there's no mention of

17   degenerative disk disease?

18  A.  No.

19  Q.  And there's no mention of facet arthropathy?

20  A.  No.

21  Q.  Now, in your report under the low back pain section --

22  A.  Mm-hmm.

23  Q.  -- you reported -- and I think this is accurate -- that

24   Margaret visited her primary care doctor on January 20th,

25   2020, with complaints of low back pain; is that correct?

1   A.  I'm sorry.  Could you repeat that?

2   Q.  Sure.  I just want to confirm that on January 20th,

3    Margaret is at her PCP complaining of low back pain?

4   A.  Yes.

5   Q.  So about four days after?

6   A.  Yes.

7   Q.  By the way, that four-day difference, from the motor

8    vehicle collision to when she's at her PCP, is that

9    clinically significant, that amount of time?

10  A.  That's too open of a question.  It depends on the

11   circumstances, you know.  Four days could make a big

12   difference in some issues.  If you want to be very

13   specific...

14  Q.  So it was a bad question on my part.  Is there anything

15   with the fact that it took Margaret four days to get to her

16   primary care doctor, where she was complaining of low back

17   pain, to suggest to you that she was lying about it or

18   exaggerating about it?

19          ATTORNEY PIEMONTE:  Objection.

20          THE COURT:  Overruled.

21          If you can answer.

22  A.  Could you repeat the question?  I'm sorry.

23  BY ATTORNEY MANGINI:

24  Q.  Sure.  Is there anything about the four days between the

25   motor vehicle collision and when she shows up at her PCP

1    office -- is there anything about that amount of time that

2    would suggest to you that Margaret was lying about having

3    back pain?

4            ATTORNEY PIEMONTE:  Objection.

5            THE COURT:  Overruled.

6            If you can answer, sir.

7    A.  I'm not sure what you're asking.  But --

8    BY ATTORNEY MANGINI:

9    Q.  Let me ask you this way.  There was a lot of testimony --

10   A.  I don't think anybody said she was lying, did they?  Or...

11   Q.  I don't know what they're going to say, but --

12           So let me ask it this way:  There's been a lot of

13   testimony about how Margaret didn't complain of low back pain

14   at urgent care the day following the motor vehicle collision,

15   okay?  And then that the first time she complained about it

16   in a record was January 20th, so three days after that urgent

17   care visit.  Does that have any clinical significance to you?

18   That it took three days for her to report back pain?

19   A.  She -- you take what she says on the face of it.  I mean,

20   she didn't report it, and then she did.  So it is purely what

21   she said it was.

22   Q.  And there is no way for you to know if Margaret had back

23    pain on January 18th or January 19th, is there?

24   A.  Unless there's a documentation or her testimony.

25   Q.  And I just want to -- on your report, again, on the low

1    back pain, you mention the X-ray was negative for a new

2    finding.

3    A.  Yes, that's correct.

4    Q.  That X-ray that you're referring to, is that the X-ray of

5    her leg and her knee?  Or is that the low back X-ray?

6    A.  I believe it was the low back, but...

7    Q.  But that was an X-ray from that day, correct?

8    A.  Again, I don't remember exactly.  But I assume it was in

9    that period of time, yes.

10         ATTORNEY MANGINI:  Can you bring up Joint

11   Exhibit 10, page 215.

12   BY ATTORNEY MANGINI:

13   Q.  So just for the record, this is Joint Exhibit 10, and this

14    is the January 20th, 2020 PCP visit?

15   A.  Yup.

16   Q.  And under History of Present Illness, it says, "Motor

17    vehicle accident"?

18   A.  Yes.

19   Q.  And under that section it states left leg was injured when

20    it went into the door; do you see that?

21   A.  I do.

22   Q.  Do you have any reason to dispute that that was -- that

23    that's what happened to Ms. Cahillane's left leg?

24         ATTORNEY PIEMONTE:  Objection.  He can't speak to

25   causation of the accident.

1      THE COURT:  Sustained.

2  BY ATTORNEY MANGINI:

3  Q.  Do you have any reason to dispute that Ms. Cahillane's

4   left leg did not go into the door?

5      ATTORNEY PIEMONTE:  Objection.

6      THE COURT:  Sustained.

7  BY ATTORNEY MANGINI:

8  Q.  Now, in your report, you also mention that Margaret

9   Cahillane did not complain of back pain after this visit

10   until July 21st, 2020; is that correct?

11  A.  She complained of some low back pain, it says.

12  Q.  Sorry.

13  A.  I documented that she did complain about it at that visit.

14   And according to what's written here, I said it wasn't until

15   the 21st that she complained on a medical record about it.

16  Q.  Okay.  And that's -- you're reading from your report, just

17   to clarify, correct?  What you just read, that was from your

18   report?

19  A.  Yes.

20  Q.  Okay.  You would agree that Margaret was also receiving

21   physical therapy for her neck and back pain through May 19th,

22   2020?

23  A.  Again, I don't know specifically when she had it.  But if

24   you showed me the record, I'll endorse what you're saying.

25  Q.  All right.

1          ATTORNEY MANGINI:  Can you pull up Joint Exhibit 4,

2    page 117.

3    BY ATTORNEY MANGINI:

4    Q.  So this is a physical therapy note dated May 19th, 2020?

5    A.  Yes.

6    Q.  And under Pain Level, it is 7 out of 10?

7    A.  Yes.

8    Q.  All right.  And under Subjective, it states, "Patient

9     arrives today complaining of 7 out of 10 low back pain,

10    stiffness, and soreness"?

11   A.  That's correct.

12   Q.  So you would agree with me that there are other medical

13    records where Margaret is complaining of low back pain in

14    between the January 20th and the July 21st statement?

15   A.  I was referring to physician records, not physical therapy

16    records.

17   Q.  Okay.  Why is there a difference between whether she's

18    complaining of pain to a physical therapist or a physician?

19   A.  There isn't a difference.  It was just that when I

20   was -- my statement was in reference to physician records

21    specifically.

22   Q.  But you don't disagree that she continued to have pain

23    after the motor vehicle collision, at least through May 19th,

24    2020?

25   A.  Yeah.  I mean, the purpose of that was just on -- the next

1  report on a medical visit was that date.  That's what I said.

2  Q.  Okay.  But I guess I'm trying to under -- is your opinion

3   that the low back pain --

4  A.  I wasn't saying she didn't have the low back pain.  I was

5   just saying that the next --

6  Q.  So she did have low back pain?

7  A.  Well, you have documented on the physical therapy, so,

8   obviously, if it is documented there, she had it.

9  Q.  Okay.

10  A.  All I was saying is the next medical visit that reported

11   it.  It was just a temporal kind of relationship there.

12  Q.  But I just -- your opinion was it wasn't until the

13   7/21/2020 visit that she, again, complains of low back pain

14   on her left side.  That's inaccurate, correct?

15          ATTORNEY PIEMONTE:  Objection.

16  A.  My statement was -- I'm sorry.

17          THE COURT:  I'm sorry.  Objection?

18          ATTORNEY PIEMONTE:  Objection.  Asked and answered.

19          THE COURT:  Okay.  Overruled.

20          Go ahead.

21  A.  Yeah.  I -- maybe it wasn't clear what I was stating in

22   terms of the -- her visit with her -- the medical providers,

23   that was the next report of it.  There's no -- no -- it

24   shouldn't have been the inference that there wasn't any pain

25   in between there.

1    BY ATTORNEY MANGINI:

2    Q.  And at this point, at least according to the record, she

3     requests to be discharged from her current plan of care

4     because she wants to focus on other issues, like her left

5     lower extremity, correct?

6    A.  Is that documented on the physical therapy?

7    Q.  Yeah.  117, under Subjective.

8    A.  Yeah.  Would like to be discharged, work on other issues,

9     like her left lower extremity pain.

10   Q.  And so we already talked about Margaret had surgery

11    sometime in the summer of 2020 and then, following that

12    surgery, she goes to her primary care and she starts

13    complaining about back pain again, correct?

14   A.  Again, you can show me the record.

15   Q.  You're aware that she had an X-ray in the summer of 2020?

16            ATTORNEY MANGINI:  Joint Exhibit 7, page 16.

17   A.  There was an X-ray in August, yes.

18    BY ATTORNEY MANGINI:

19   Q.  And that X-ray -- according to that X-ray, there's a new

20    finding of a compression fracture?

21   A.  Yeah.  It was a mild compression fracture, by T12 and L2.

22   Q.  And the reason for this exam, at least according to the

23    History, was "Persistent pain post injury sustained in a car

24    crash in January of 2020," correct?

25   A.  The -- yes, that's what it says.  The problem is, there's

1    no definition of where she was having the pain.  There's no

2    description.  It just says low back pain.  It doesn't say

3    where in her low back, so...

4       It's not specific, you know.  So if you ask me that, I

5    can't say that that's the pain that she was, you know,

6    complaining of.

7    Q.  Okay.  But just to clarify, under History, it says, "Back

8    pain.  Persistent pain post injury sustained in a car injury

9    [sic]."  And then they take an X-ray of her lumbar spine?

10   A.  That's correct.

11   Q.  And, again, on this X-ray, that's when they find the

12   compression fracture?

13   A.  Yes.

14   Q.  And this is the first X-ray of Margaret Cahillane's lumbar

15   spine, correct?

16   A.  Yeah.  There was also --

17   Q.  This is the first X-ray of her lumbar spine post-motor

18   vehicle collision, correct?

19   A.  I'm not sure.  I can't -- but if you show me the records,

20   the document, I'll be glad to.  But I don't remember.

21   Q.  Well, if you look under Comparison, the comparison is to

22   2011 and then a CT of her abdomen from 2016?

23   A.  Right.

24   Q.  So would that suggest to you that there was no --

25   A.  Provided that they had access to all of her imaging,

1    which, you know, that's an assumption you have to make.

2    Q.  So provided that they had access to all of her imaging, is

3     it fair to say that, at least according to the comparisons,

4     there doesn't seem to be any more recent studies of her lower

5     back?

6            ATTORNEY PIEMONTE:  Objection.

7    A.  I can't -- again, I'm giving you the caveat that not all

8     radiologists or radiology places have access to all of the

9     records.  So I can't be assured of that.

10           THE COURT:  All right.  Objection overruled.

11   BY ATTORNEY MANGINI:

12   Q.  And according to this X-ray, the compression fracture is a

13    new finding?

14   A.  Yes.

15   Q.  And then after this X-ray --

16           ATTORNEY MANGINI:  You can take this down.

17   BY ATTORNEY MANGINI:

18   Q.  After this X-ray, Margaret has -- they send her for an MRI

19    to do further studying, correct?

20   A.  Yeah.  That's the only way you can tell whether

21    it's -- how old the fracture is.

22   Q.  And that's the acute, subacute, those types --

23   A.  Yeah.  And in terms of therapies too.  If it is an old

24    fracture, there's nothing you're really going to do about it,

25    so...

1   Q.  And what does "acute" mean?

2   A.  Acute typically means within a three-month period.

3   Q.  And what about "subacute"?

4   A.  I'm not sure how they're defining it here, but...

5   Q.  Does it typically mean six months to a year?

6   A.  I don't -- I don't know.  You'd have to ask her

7    radiologist what they mean by that.

8   Q.  But "acute," your understanding is it means within a

9    certain amount of --

10  A.  Medically "acute" typically means within three months.

11   And three-month period is important because if you were going

12   to do any kind of intervention, like kyphoplasty or putting

13   glue in, there's a certain window of when that's an option.

14   So the fact it's acute means that it's -- it could be very

15   recent.

16          ATTORNEY MANGINI:  Can you pull up Joint Exhibit 3,

17   page 4.  Actually, can you start on page 3 just for

18   completeness.

19  BY ATTORNEY MANGINI:

20  Q.  So this is Joint Exhibit 4.  And this is the MRI that

21   happened in September of 2020?

22  A.  Yes.

23  Q.  And the MRI of her lumbar spine?

24  A.  Correct.

25          ATTORNEY MANGINI:  And if you go to page 4.

1  BY ATTORNEY MANGINI:

2  Q.  It says, "Acute to subacute mild compression fracture,"

3   correct?

4  A.  Yes.

5  Q.  And did I understand you correctly that it's your opinion

6   that the compression fracture itself is not from the car

7   crash?

8  A.  I -- I didn't say that.  All I'm saying is this reading

9   could lead you to believe that it could have occurred after

10  the car accident because of the acute -- it's how they look

11  at it.  In terms of what it looks like, they can kind of

12  determine what age it is.  And as I said, acute is usually,

13  you know, within three months.

14  Q.  But you don't know what "subacute" means?

15  A.  Not -- no, I don't.

16  Q.  So do you have an opinion, as you sit here today, as to

17   whether or not the compression fracture itself was because of

18   the motor vehicle collision?

19  A.  No.

20              ATTORNEY PIEMONTE:  Objection.

21              THE WITNESS:  Sorry.

22              THE COURT:  Overruled.

23  BY ATTORNEY MANGINI:

24  Q.  So no opinion as to that?

25  A.  No.

1          ATTORNEY MANGINI:  You can pull that record down.

2    BY ATTORNEY MANGINI:

3    Q.  In your report, you also opine that compression

4     fractures -- that not all fractures are painful -- not all

5     compression fractures in the vertebrae are painful, correct?

6    A.  That's correct.

7    Q.  They're not usually chronically painful and will

8     eventually heal?

9    A.  Usually, yeah.

10   Q.  That's not applicable to everyone, though, correct?

11   A.  Correct.

12   Q.  And in this case, Margaret had osteopenia?

13   A.  I don't recall her bone density, so -- but if you show me

14    a record that documents that, I'll be glad to...

15   Q.  And she was about 61 at the time of the collision, so she

16    was a little bit older?  I know it is relative, but she was a

17    little bit older?

18   A.  You can't make that assumption.  It all depends how much

19    calcium you took in as a young woman as to, you know, your

20    status and your genetics.  There's a lot of variability there

21    as to osteopenia.

22   Q.  And she also had at least a diagnosis in November of 2019

23    of polyarthritis?

24   A.  Yes.

25   Q.  Do you know when Margaret's compression fracture healed?

1    A.  I have no -- I have no idea when it even occurred.  How

2    can I tell when it healed?  All I can say is on my exam she

3    was definitely not -- when I examined her, she definitely had

4    no symptoms.

5    Q.  So in March of 2025, she had no symptoms around the

6    compression fracture?

7    A.  Yeah.  That wasn't where she was complaining of back pain.

8    Q.  Okay.

9    A.  And, again, I already testified that, unfortunately, her

10   primary care and other providers didn't specifically -- they

11   just said low back pain.  They didn't say at which level or,

12   you know, multiple levels.  They weren't very specific.  So

13   it is hard, looking back on records, to know exactly what

14   they were talking about.

15   Q.  Do you have the ability to call doctors as part of your

16   medical exams?

17   A.  I'm sorry?

18   Q.  Do you have the ability to call doctors as part of your

19   medical exams if you have questions?

20   A.  If I was seeing a -- my own patient?

21   Q.  If you're doing a medical -- I'm sorry.  If you're doing

22   an independent medical exam like in this case.

23   A.  I have never done an IME before this visit.

24   Q.  I'm sorry.  Say that again.

25   A.  I've never done an IME for any patient prior to seeing the

1    plaintiff.

2    Q.  This was your first insurance medical exam?

3    A.  Yeah.  We just don't do them.

4              ATTORNEY PIEMONTE:  Objection.

5    BY ATTORNEY MANGINI:

6    Q.  I'm sorry.  First independent medical exam?

7    A.  Yeah.  We don't do them.

8              THE COURT:  I'm sorry.  The objection was what?

9              ATTORNEY PIEMONTE:  It was a misstatement.  It has

10   been corrected.

11             THE COURT:  Okay.  Thank you.

12   BY ATTORNEY MANGINI:

13   Q.  So you have never done this process before, where you

14    interviewed -- where you have been hired by either the

15    plaintiff or defendant to do an exam?  Is that what you mean?

16   A.  No.  I practice -- I do it every day for a living.  I

17    don't do it for insurance companies.

18   Q.  I'm just trying to understand.  Before Margaret Cahillane,

19    had you ever conducted an exam as a hired expert for either a

20    plaintiff or a defendant?

21   A.  To do an IME -- I just said I don't do them, yeah.

22   Q.  So Margaret is your first one?

23   A.  I see patients all of the time.  There's nothing different

24    from a daily evaluation of a patient.

25   Q.  Okay.  In your daily evaluation of the patients, if you

1    have question of another doctor, do you call that doctor or

2     ask for further information?

3   A.  Well, it depends on what it is, yeah.

4   Q.  Okay.  And did you do that in Margaret's case?

5   A.  No.  I didn't think it was appropriate to call anybody.  I

6     just was doing an independent exam of her.

7   Q.  In any event, is it your opinion that Margaret's continued

8     complaints of pain in her back are from degenerative disk

9     disease and facet -- I keep pronouncing it

10    incorrectly -- arthropathy?

11  A.  All I can say is when I saw her, her pain was located over

12    the L5-S1 facet joint on the left side.  That correlates with

13    the arthritic degenerative changes that were present before

14    the accident and then were present afterwards.

15  Q.  So the arthritic changes were present before the accident

16    and after the accident, but there's no evidence of any active

17    treatment for those changes preaccident?

18  A.  Well, again, she complained of low back pain.  We don't

19    know exactly where that pain was, so I can't suppose where

20    her pain was prior to that, other than the description she

21    had chronic low back pain.

22  Q.  Right.  But where is the description of chronic low back

23    pain that you're getting?

24  A.  She had low back pain, I mean.

25  Q.  She had a complaint of low back pain in 2012 at a PT

1    visit.  That's what we looked at.  Did you see any complaints

2    of low back pain or any treatment for low back pain before

3    that and the motor vehicle collision?

4    A.  Again, you've -- I haven't looked at all of the records

5    with you, but you're telling me that there isn't, so I assume

6    that you're correct.

7    Q.  And, again, at least on that November 4th, 2019 record

8    that we looked at, her PCP did not even list degenerative

9    disk disease or facet arthropathy as a problem in the Problem

10   List, correct?

11   A.  Yes.

12   Q.  And Margaret never, as far as the records show, Margaret

13   never underwent injections to her lower back prior to the

14   motor vehicle collision?

15   A.  Other than the SI joints that were done after --

16   Q.  Sorry.  Prior to the collision.

17   A.  Yeah.  Again, I'm just being complete.  No.

18   Q.  And at some point Margaret was diagnosed with sacroiliitis

19   after the collision?

20   A.  After the collision, yes.

21   Q.  What is sacroiliitis?

22   A.  It's irritation of the sacroiliac joint, either from

23   arthritis or gait abnormalities, frequently productive.

24   Q.  Is it your opinion or your belief that the sacroiliitis is

25   from Margaret's leg length discrepancy?

1   A.  Again, I didn't -- I didn't comment on that.  That

2   was -- my quote is from the orthopedic surgeon and the

3   physiatrist that saw her.  They're the ones that opined on

4   that.  Since when I saw her, she didn't have pain in her SI

5   joint, so...

6   Q.  Well, she had pain over S1, right?

7   A.  She had pain over the L5-S1 facet.  That's nowhere near

8   the sacroiliac joint.

9   Q.  Is a leg length discrepancy -- would you agree that's a

10   preexisting condition?

11   A.  I -- again, I don't know if she was evaluated before and

12   if anybody noticed it before.  I can't tell when that

13   developed.  Unless there's something documented in the

14   record, I can't opine about that.

15   Q.  I think you also just started [sic] that an antalgic --

16   I'm sorry.  Let me rephrase that.

17       You just stated that an antalgic gait could cause

18   sacroiliitis?

19   A.  It could cause pain in the sacroiliac joint.

20   Q.  And you would agree that Margaret had an antalgic gait for

21   at least some period of time after this motor vehicle

22   collision?

23   A.  There was some documentation, I believe, in the record,

24   yes.

25   Q.  Do you know how long that antalgic gait lasted for?

1    A.  No, I don't.

2    Q.  Did you review the Pioneer Spine and Sport records when

3     authoring your opinion regarding the sacroiliitis?

4    A.  I'm sorry?

5    Q.  I'm sorry.  I turned away from the mic.

6        Did you review the Pioneer Spine and Sports records when

7     you authored your opinion regarding Margaret's sacroiliitis?

8    A.  I mean, I reviewed the records.  I saw the report and the

9     injections.

10                ATTORNEY MANGINI:  Can you pull up Joint Exhibit 11,

11    page 2.

12   BY ATTORNEY MANGINI:

13   Q.  This is a record, January 9th, 2023, from Pioneer Spine

14    and Sports.

15   A.  Yes.

16   Q.  And I'm just going to -- I think it is easier.  I'm just

17    going to show you the full record again.  That way we don't

18    have to scroll.

19   A.  Okay.  No problem.

20   Q.  And just for the record, this is Bates stamped 2 through

21    5.  And I'm going to ask you to flip to the fourth page.

22   A.  Well, it is the third, but it is marked the fourth.  But

23    it's --

24   Q.  And do you see that highlighted section?

25   A.  I do.

1   Q.  All right.  And it says, "Most likely her underlying left

2    knee meniscal tear and altered gait is causing repetitive

3    chemical stress making it difficult for her left SI joint

4    pain to improve."  Did I read that correctly?

5   A.  That's what it says, yes.

6   Q.  Do you know what chemical stress is and what that means?

7   A.  No.

8           ATTORNEY MANGINI:  Can you pull up Joint Exhibit 9,

9    page 542.  542.

10  BY ATTORNEY MANGINI:

11  Q.  I know this is very small.  I'm just going to -- I think

12   we can zoom in a little bit.

13  A.  I would have gotten the stronger glasses, but...

14  Q.  So this is a record from November of 2016 that was

15   discussed in earlier testimony, about complaints of Margaret

16   maybe having back pain on this date in 2016.  Do you remember

17   reviewing this medical record as part of your --

18  A.  Not specifically, no.

19  Q.  Now, according to this, it says that Margaret's pain is 8

20   out of 10.  Do you see that in the top --

21  A.  Yes.

22  Q.  -- top left side?

23  A.  Yes.

24  Q.  But if you go to the right side under Patient Stated

25   Reason For Admission, it says, "I felt sick for the past five

1  days"?

2  A.  Yes.

3  Q.  Correct?

4  A.  I see that, yeah.

5  Q.  And if we go, I believe, to the next page, if you look at

6   the left side for the current symptoms, she's got nausea and

7   acute diarrhea, correct?

8  A.  Yes.

9  Q.  And then there are there was some diagnostics that were

10   also taken as part of this visit.

11         ATTORNEY MANGINI:  Can you go to 573.

12  BY ATTORNEY MANGINI:

13  Q.  You would agree with me that this visit appears to be a

14   sick visit and not a visit where she's complaining of some

15   kind of strain or anything like that, correct?

16  A.  It's hard because it is so blurry, but it's -- it appears

17   that there's an acute problem going on, yes.

18         ATTORNEY MANGINI:  Thank you.  You can take that

19  down.

20  BY ATTORNEY MANGINI:

21  Q.  All right.  So moving on to the left hip pain.  I think

22   you mentioned on direct Ms. Cahillane was diagnosed with

23   trochanteric bursitis?

24  A.  Trochanteric, yes.

25  Q.  Trochanteric.  All right.

1      And would you agree that there's multiple causes of

2  trochanteric bursitis?

3  A.  I mean, it could be spontaneous.  It could be, you know --

4  I assume there's many ways that it could evolve.

5  Q.  It could be from trauma?

6  A.  Could be, I guess.  Any inflammatory process that would be

7  present in a bursa could be --

8  Q.  It could be caused by an antalgic gait?

9  A.  Usually not antalgic gait, but...

10  Q.  Preexisting conditions could also increase the risk for

11  post -- I'm sorry.  Preexisting conditions could also

12  increase the risk for trochanteric bursitis?

13  A.  I'm not sure what you're saying.  The fact that she had it

14  before would be an increasing likelihood of having it again.

15  Q.  Or if she's got -- if someone has, for example,

16  preexisting arthritis, could that increase --

17  A.  But this is not in the joint -- the bursa is not a joint,

18  so it is not arthritis.

19  Q.  Okay.  What is post-traumatic trochanteric bursitis?

20  A.  It would be inflammation that occurs after trauma.

21  Q.  And in terms of the left hip, you put in your report, I

22  think, that the reason -- or at least one of the

23  reasons -- that you didn't think the left hip pain was

24  related because Margaret Cahillane -- or you didn't see any

25  complaints in the medical records until January 16th of 2024;

1    is that correct?

2    A.  Yeah, of the lateral hip pain, yeah.

3    Q.  And that's why you believe her hip pain was not related to

4     the motor vehicle collision?

5    A.  Yes.  And the length of time that was, you know,

6     afterwards.  This was --

7    Q.  Four years after?

8    A.  -- four years later, yeah.

9    Q.  Do you remember Ms. Cahillane receiving a left hip X-ray

10     in August 25th, 2020?

11          ATTORNEY MANGINI:  Joint Exhibit 7, page 17.

12    A.  I know she had some X-rays.  I'm not sure of the dates of

13     it, yeah.

14    BY ATTORNEY MANGINI:

15    Q.  This is -- so, just for the record, this is a hip X-ray

16     from August 25th, 2020, correct?

17    A.  Yes.

18    Q.  And the "Indication" is hip pain?

19    A.  Yup.

20    Q.  And you also reviewed the Hampden County Chiropractic

21     records as part of the documents you were provided, correct?

22    A.  Yes, I believe so.

23          ATTORNEY MANGINI:  Can you pull up Joint Exhibit 12

24     page 6.

25

1   BY ATTORNEY MANGINI:

2   Q.  And do you see the diagram where it says "Please draw in

3    the painful areas below"?

4   A.  Mm-hmm.

5   Q.  It looks like Margaret placed an "X" on her low back, hip?

6   A.  Yeah.  That's not her hip.  That's her low back.

7           ATTORNEY MANGINI:  And can you go to Joint

8    Exhibit 12, page 17.

9    BY ATTORNEY MANGINI:

10  Q.  All right.  And this --

11  A.  That's in a similar place that I said I saw -- when she

12   presented to me, that she had pain in that area.

13  Q.  So she's reporting the same pain in the same area at that

14   chiropractic visit that she was reporting to you in --

15  A.  Again, it's hard to know because, you know, it's a diagram

16   and people mark.  It is not always accurate, but...

17  Q.  And this is a final report dated 3/3/21 from the

18   chiropractic's office?

19  A.  3/3/21, yes.

20  Q.  And do you see, under the box with "Subjective

21   Complaints," she's got low back and hip pain on the left side

22   checked off, correct?

23  A.  That's correct.

24  Q.  So this is from -- so we just saw an X-ray from 2020, and

25   now we're seeing Hampden County Chiropractic records from

1  2021 that also complained of hip pain, correct?

2  A.  Mm-hmm.

3          ATTORNEY MANGINI:  And can you scroll down to

4  page 18.

5  BY ATTORNEY MANGINI:

6  Q.  And this -- the next page of that record, it says,

7  "Progress:  Improvement impaired due to extent of injury."

8  Did I read that correctly?

9  A.  That's what it says, yes.

10 Q.  And under Prognosis, I know it is a little bit faded, but

11 it says --

12         ATTORNEY MANGINI:  Can you scroll down a little bit.

13 BY ATTORNEY MANGINI:

14 Q.  "A full recovery is not anticipated.  Patient has reached

15 maximum medical improvement."  Did I read that correctly?

16 A.  Yup.

17         ATTORNEY MANGINI:  You can take that record down.

18 BY ATTORNEY MANGINI:

19 Q.  Now, after this discharge from chiropractic treatment on

20 March 3rd, 2021, Margaret is scheduled, actually, to have an

21 arthroscopic surgery of her left knee, but then the heart

22 attack happens, correct?

23 A.  Yes.

24 Q.  Would you agree with me that knee pain can cause someone

25 to experience hip and back pain due to an antalgic gait?

1   A.  If your gait is thrown off, as I said before, it can cause

2    misalignment and biomechanical changes that cause back pain.

3   Q.  Okay.  Do you remember reviewing another hip X-ray that

4    Margaret had in March 24th, 2020 --

5          ATTORNEY MANGINI:  Joint Exhibit 16, page 4.

6    BY ATTORNEY MANGINI:

7   Q.  It says, "History:  Hip pain, history of motor vehicle

8    accident two years ago," correct?

9   A.  Mm-hmm.

10  Q.  And then on May 16th, 2022, so about six weeks later,

11   she's at New England Orthopedic Surgeons.

12         ATTORNEY MANGINI:  Joint Exhibit 8, page 11 to 12.

13   BY ATTORNEY MANGINI:

14  Q.  It says this is from May 16th, 2022.

15      And under History, the pleasant woman pre -- I'm sorry --

16   "This pleasant woman presents today for a new problem of left

17   hip pain.  She was in a car accident in January of 2020 where

18   she was struck on her driver's side by someone passing."

19      Did I read that correctly?

20  A.  Mm-hmm.

21  Q.  Okay.  And she reports pain "about the lateral aspect of

22   her hip which had progressively gotten worse over the past

23   two years."

24  A.  Mm-hmm.

25  Q.  And under the Assessment --

1    ATTORNEY MANGINI:  If you can scroll down.

2    BY ATTORNEY MANGINI:

3    Q.  -- she's diagnosed with post-traumatic trochanteric

4    bursitis, correct?

5    A.  I see that, yes.

6    Q.  And it looks like at this point she received an injection?

7    A.  Mm-hmm.

8    Q.  And then, again, she's back in NEOS in November 30th of

9    2022, page 9 and 10, reporting pain in her hip, her knee, and

10   her left back -- I'm sorry -- left leg and back, correct?

11   A.  She reports a problem with shoulder -- fracture.  "She

12   notes that ever since she has pain down the lateral aspect of

13   her entire leg..."

14   Q.  "From her hip to her knee including her lower leg" --

15   A.  And the lower leg also.

16   Q.  And at this point the provider believes that her hip pain

17   might not actually be -- I'm sorry -- that the pain might not

18   actually be from her hip but be originating from her lumbar

19   spine?

20   A.  Well, that sounds like radiculopathy.  So typically, that

21   would -- you'd worry about having a disk herniation in your

22   back.

23   Q.  So you would agree with me that Margaret Cahillane

24   complained of left hip pain long before January 16th, 2024

25   [sic], correct?

1  A.  Well, I mean, this -- this -- what you're showing me here,

2  no.  But the trochanteric bursa, yes.

3  Q.  Right.  So putting this record --

4  A.  This is radiculopathy.  This is not hip pain.

5  Q.  Putting this record aside, the prior records that we just

6  looked at would suggest to you that Margaret actually was

7  complaining of hip pain starting at least August of 2020 when

8  she had that first X-ray?

9  A.  I believe so, yes.  Yeah.

10 Q.  And that's only five to six months -- I'm sorry -- seven

11 months after the motor vehicle accident?

12 A.  Yes.

13 Q.  Can you explain why you omitted those five different dates

14 of service from your report?

15 A.  Perhaps I didn't see it or I missed it, but on my

16 review...

17            ATTORNEY MANGINI:  You can take that down.

18 BY ATTORNEY MANGINI:

19 Q.  In terms of the left shoulder -- we talked about this --

20 but it is your opinion that the left shoulder injury is

21 related, correct?

22 A.  Yes.

23 Q.  And I just want to clarify something in your report.  You

24 referenced a delay in surgery.  But there was no delay in

25 Margaret's surgery, correct?

1  A.  In terms of -- I mean, there was a delay in terms of

2  diagnosis.  It was long after -- several months after.

3  Q.  Okay.

4  A.  That's what I was referring to.

5  Q.  Okay.  And the Popeye deformity, that's a permanent

6  injury, correct?  That doesn't just go away?

7  A.  Again, I would assume so.  But I'm not an orthopedic

8  surgeon, so you'd have to ask them.

9  Q.  And, again, I think -- but just to confirm -- you really

10  can't opine on anxiety and depression because you're not a

11  psychiatrist or a psychologist or anything like that,

12  correct?

13  A.  In terms of diagnosis and stuff, yeah.

14  Q.  Now, there was also discussion about how Margaret was on

15  Vicodin -- the same prescription, basically, from 2009 really

16  up through today, correct, for the Vicodin?  That's never

17  changed?

18  A.  There's -- again, I think in the perioperative period, she

19  might have gotten additional pain meds.  I want to make that

20  as an exclusion.  But in terms of what she was getting from

21  her primary care, it looked consistent the whole time.

22  Q.  But you would agree with me that after the motor vehicle

23  collision, Margaret was reporting additional symptoms even

24  though she was still on the same Vicodin prescription?

25  A.  The acute injury, yes.

1   Q.  So although she was -- the prescription itself might not

2    have changed, her symptoms really changed after the motor

3    vehicle collision?

4   A.  Well, she had new injuries, yes.

5   Q.  Now, you talked about Margaret's preexisting level of

6    activity and how there's a discrepancy between what she

7    reported to you and what is allegedly reported in the medical

8    records, correct?

9   A.  Yes.

10  Q.  Do you know what Dr. Bedford meant when he said she had a

11   low activity level?

12  A.  I think you have to ask him.

13  Q.  That's a subjective term, "low activity level," correct?

14   I mean, it could mean a lot of things to different people?

15  A.  Yeah.  We can't -- it is what it is.  We're just, you

16   know, commenting that's what he described it as.

17  Q.  I'm going to show you a medical record.

18          ATTORNEY MANGINI:  Exhibit 10, Page 733.

19   BY ATTORNEY MANGINI:

20  Q.  This is a consultation that was sent over to Dr. Bedford

21   back in November of 2016.  And do you see where it says, "She

22   has seen Dr." -- blank -- "and tells me she has her Fitbit

23   and walks four to five miles a day"?

24  A.  I'm sorry.

25  Q.  It's the very last -- "she has seen doctor" -- and then

1    it's blank.  I don't know who the doctor is, but --

2    A.  She's talking about pancreatitis and the alcohol,

3    trauma -- no history of abdominal trauma.

4    Q.  It is in the paragraph, "In terms of possible

5    etiologies..."

6            ATTORNEY PIEMONTE:  Objection, your Honor.  He's

7    asking to -- he said, "Let me review the whole record."  So I

8    ask that he be permitted the time to do that.

9            THE COURT:  Okay.  Sure.  Sustained.

10           Just let him take the time to look.

11   A.  "She has seen Dr." -- it's missing -- "and tells me she

12   has her Fitbit and walks four to five miles a day," yes.

13   BY ATTORNEY MANGINI:

14   Q.  So that would suggest that -- at least in 2016 -- Margaret

15   Cahillane was walking four to five miles a day?

16   A.  It's what the record states.

17   Q.  And do you have any reason to believe that Margaret was

18   exaggerating or lying to you about her preexisting level of

19   activity?

20           ATTORNEY PIEMONTE:  Objection.  She didn't say it to

21   him.

22   BY ATTORNEY MANGINI:

23   Q.  At the -- I'm sorry.

24           THE COURT:  Sustained.  The objection is sustained.

25

1    BY ATTORNEY MANGINI:

2    Q.  When you did the evaluation of Margaret, you said you

3     asked her about her preexisting level of activity, correct?

4     And she told you she golfed, she hiked, she did all of this

5     stuff before the accident?

6    A.  That's correct, yes.

7    Q.  Do you have any reason to believe she was either

8     exaggerating or lying about what she told you during that

9     exam?

10   A.  I don't make judgments.  She says what she said.  But all

11   I did was ask why her primary care -- who knows her the best,

12   who has the most records, every record -- commented on low

13   activity levels and their concern -- cardiovascular concerns;

14   that's all.

15   Q.  We talked about this.  But you treat your own patients.

16    Are those motor vehicle collision patients as well?

17   A.  Occasionally, yeah.  We treat all types of patients with

18    all experiences and all histories, so, yes.

19   Q.  And some of those patients, do they have multiple injuries

20    to deal with?

21   A.  Sometimes, yeah.  I mean, we don't see them in the acute

22    period.  We're on the chronic side, yes.

23   Q.  Would you agree that someone with a preexisting condition,

24    such as arthritis, may be more susceptible to injuries than,

25    say, a healthy 35-year-old?

1    A.  I think that is too generalized of a statement.  I can't

2    respond to that.  If you're more specific, I could possibly

3    give an answer.

4    Q.  By the way, in your review of the prior medical records,

5    did you see anywhere that Margaret Cahillane was diagnosed

6    with alcoholism?

7    A.  Did I see?  No.  The only thing I saw was there was a

8    concern about her alcohol use.

9    Q.  But she was never diagnosed with alcoholism?

10   A.  Not that I know of, no.  She did have fatty liver disease,

11   which is probably related to excess alcohol use.

12   Q.  Do you know that, or are you just assuming that?

13   A.  It was in the records.  It was in the one of the records

14   you actually showed me.

15   Q.  In your report, I think when you were talking about the

16   chronic pain, you state --

17            THE COURT:  Counsel, is this a good time to break?

18   I don't know how much longer you have.

19            ATTORNEY MANGINI:  I have, like, two or three

20   questions left.

21            THE COURT:  Then we're going to come -- yeah.  Okay.

22   We might as well do your two or three questions, and we'll

23   take our break.

24   BY ATTORNEY MANGINI:

25   Q.  I think you mentioned on direct -- and it's in your

1    report -- that you didn't think her chronic pain changed at

2    all because she wasn't referred to any specialist after the

3    motor vehicle collision?

4  A.   What I was saying is there wasn't such an excessive change

5    that the primary care started to feel uncomfortable, that he

6    couldn't treat with what he was doing.  Typically, when you

7    have that traumatic of a change, typically a primary care

8    will refer to a specialist to help control it.  But there

9    doesn't even appear that he made any effort to make any

10   changes.  So he wasn't concerned about it.  So I -- by, you

11   know, just assumption that there wasn't a major change in her

12   chronic pain.

13 Q.   Okay.  But you would agree that Pioneer Spine and Sports

14   is a specialist, correct?

15 A.   I'm sorry?

16 Q.   Pioneer Spine and Sports is a specialist?

17 A.   Was it the orthopedic you're talking about?

18 Q.   Pioneer Spine and Sports Physicians is a pain management.

19 A.   Yeah.  I don't know what kind of physician it was, but...

20 Q.   But they're a specialist?

21 A.   I believe so, yeah.  I think it's orthopedics, but, yeah.

22 Q.   And New England Orthopedic Surgeons is a specialist?

23 A.   Yes.  Yeah.

24 Q.   And Orthopedic Care Center is a specialist?

25 A.   I know, but you asked about chronic pain.

1  Q.  Right.  But didn't you say that her chronic pain -- you

2   didn't think there was an increase because she was not going

3   to any specialist after?

4  A.  I meant she wasn't re -- the pain -- the treatment of the

5   pain specifically wasn't to the extent that she needed to see

6   a specialist.

7  Q.  But didn't she see --

8  A.  But I'm talking about pain.  I'm not talking about

9   orthopedics or any other specialty group.

10  Q.  And you also --

11  A.  Orthopedics doesn't treat chronic pain.  They'll treat an

12   injury and that, but then after they've done what they can

13   do, they'll refer to the pain centers.

14  Q.  Okay.  And you don't know whether Pioneer Spine and Sports

15   is a pain center or not?

16  A.  I have no idea.

17  Q.  And then, finally, you talked about Margaret's baseline

18   and what it was -- you know, you think she's back to

19   baseline.  What was her baseline pain levels before the motor

20   vehicle collision?

21  A.  I'm just talking about generalized, based on her exam.

22   Certainly, there was lots of reports in the records of, you

23   know, very high degrees of pain in various parts of her body.

24   And on my exam, given what I saw, I don't see any dramatic

25   change, even if it might have been improved since -- compared

1  to those old records.

2  Q.  So were you just focusing on the records post-motor

3   vehicle collision?

4  A.  No.  Prior.

5  Q.  Okay.  But what was her baseline pre-motor vehicle

6   collision?  What was --

7  A.  She had polyarthritic pains in all of her joints.

8  Q.  Do you know what her pain levels were at because of that

9   polyarthritic arthritis?

10  A.  They weren't recorded.  But you have to look at the

11  objective findings that -- did anybody intervene?  Did they

12  increase analgesics?  Did they -- was there a concern about

13  uncontrolled pain?  That's what I'm referring to.

14      It appears that the treatment and the therapies appear to

15  mirror each other.  And there really wasn't an escalation in

16   interventions, other than the surgical interventions that

17  we've talked about.

18  Q.  And the physical therapy?

19  A.  Yes.

20  Q.  And the chiropractic treatment?

21  A.  Yes.  That's correct.

22  Q.  And the multiple orthopedic visits?

23  A.  And the what?

24  Q.  The multiple orthopedic visits.

25  A.  Yeah.  She certainly saw orthopedics, yes.

1           ATTORNEY MANGINI:  No further questions, your Honor.

2           THE COURT:  All right.  So you can step down.  Thank

3    you very much.

4           THE WITNESS:  Okay.

5           THE COURT:  So 2:15, Christina?

6           So we'll come back at 2:15.

7           THE CLERK:  All rise.

8    (Recess taken at 1:23 p.m. until 2:17 p.m.)

9           THE CLERK:  Your Honor, Court is back on record.

10          Your witness may resume the stand.

11          ATTORNEY PIEMONTE:  May I proceed?

12          THE COURT:  Sure.  Yes.

13          ATTORNEY PIEMONTE:  Thank you, your Honor.

14                        REDIRECT EXAMINATION

15   BY ATTORNEY PIEMONTE:

16   Q.  Dr. Michna, you were asked some questions about

17    Ms. Cahillane's chronic pain and her prescription of Vicodin.

18    Do you recall that line of questioning?

19   A.  Yes.

20   Q.  Do you recall seeing medical records where she was

21    prescribed Vicodin for her back pain as far back as 2016?

22   A.  Yes.

23   Q.  You were also asked about back pain and previous

24    complaints of back pain.  Let me show you Joint Exhibit 7 at

25    page 118.

1    And the date of this report is December 11th, 2005.  Do

2  you see that record?

3  A.  I do.

4  Q.  Is this one of the records that you reviewed --

5  A.  Yes.

6  Q.  -- in forming your opinion in this case?

7  A.  I did, yes.

8  Q.  And what was the exam that was requested?

9  A.  It's an X-ray of the spine.

10  Q.  X-ray of the spine?

11  A.  Lumbar spine.

12  Q.  Okay.

13          ATTORNEY PIEMONTE:  And if you could scroll down a

14  bit.

15  BY ATTORNEY PIEMONTE:

16  Q.  And do you see the "History" on that record?

17  A.  Yes.

18  Q.  What was the reason for the X-ray of the spine?

19  A.  Low back pain.

20  Q.  And what were the findings?

21  A.  Some minimal scoliosis and some osteophytes of anterior

22  were noted.

23  Q.  And that was in 2005?

24  A.  Yes.

25  Q.  Is scoliosis -- I'm sorry.  It says, "minimal-convex right

1    thoracolumbar scoliosis."

2    A.  Scoliosis, right.

3    Q.  What is that?

4    A.  It is a curvature of the spine.

5    Q.  When you mentioned degenerative changes, is scoliosis a

6     degenerative change of a spine?

7    A.  Well, it can be considered a degenerative change, yes,

8     because of the curvature and the alteration of the anatomy.

9    Q.  Now, directing your attention to Joint Exhibit 7 at

10    page 144.  Do you see the date of this exam as 9 -- September

11    21st, 2011?

12    A.  Yes.

13   Q.  And scrolling down, what was the reason for the imaging on

14    that date?

15   A.  Again, low back pain.

16   Q.  And what test was ordered in 2011?

17   A.  Again, X-rays of the lumbar spine.

18             ATTORNEY PIEMONTE:  And scrolling down to the

19    Impression.

20    BY ATTORNEY PIEMONTE:

21   Q.  Did you review this record in forming your opinion in this

22    case?

23   A.  Well, it was certainly part of it, yeah.

24   Q.  And what was the Impression in 2011?

25   A.  It was similar to 2005.

1   Q.  And, finally, directing your attention to January 22nd,

2    2020, Joint Exhibit 7 at MMC-11, again, the date of this

3    record is January 22nd, 2020; is that correct?

4   A.  Yes.

5   Q.  All right.  And then do you see the History there?

6   A.  Yes.

7   Q.  What was the reason for the exam or the imaging?

8   A.  Well, this is chest that they're showing me right here.

9   Q.  Okay.  And looking at the findings, I'm going to ask you

10    to review the first sentence of those findings and ask you if

11    you reviewed that in forming your opinion in this case?

12   A.  Yeah.  The "radiographs of the chest demonstrate minor

13    [sic] degenerative change of the thoracic spine, also seen on

14    prior examinations in 2018."

15   Q.  So in January 12th of 2020, the findings showed, among

16    other things, degenerative changes of Ms. Cahillane's

17    thoracic spine; is that correct?

18   A.  Yes.

19   Q.  And you were asked about a compression fracture that you

20    testified was mild in the area of the L2 spine.  Do you

21    recall that testimony?

22   A.  Yes.

23        ATTORNEY PIEMONTE:  I'll ask you to show Joint

24    Exhibit 3 at page 4.

25

1    BY ATTORNEY PIEMONTE:

2    Q.  You were showed this on direct examination.  I'm going to

3     scroll down to the Impression.  Could you review that

4     impression and --

5    A.  Yes.

6    Q.  -- tell us, is that -- is that record one of the records

7     you reviewed in forming your opinion in this case?

8    A.  Yes.

9    Q.  And what was the impression on that date?

10   A.  "Acute to subacute mild compression fracture L2.  No

11    significant retropulsion," which is a movement of the bone

12    into the spinal canal.  "Mild degenerative changes of the

13    spine, without high-grade stenosis or nerve root

14    compression."

15   Q.  So, again, on September 18th, 2020, did at least

16    imaging --

17            ATTORNEY PIEMONTE:  You can take that down.  Thank

18   you.

19    BY ATTORNEY PIEMONTE:

20   Q.  -- imaging results show that Ms. Cahillane was suffering

21    from degenerative changes of her spine?

22   A.  Yes.

23   Q.  Now, moving to the neck.  You were asked about neck pain

24    prior to 2020.  Do you recall that --

25   A.  Yes.

1  Q.  -- line of questioning?

2  A.  Yes.

3          ATTORNEY PIEMONTE:  Ask to show Joint Exhibit 7 at

4  142.  If you could scroll down to the date, please.

5  BY ATTORNEY PIEMONTE:

6  Q.  Do you see the date of this?

7  A.  9/21/11.

8  Q.  And what was the reason for the radiographs in 2011?

9  A.  Neck pain.

10  Q.  And what was the Impression and Finding on that day?

11  A.  "Cervical spondylosis," which is arthritis of the spine.

12  Q.  And does arthritis of the spine cause pain?

13  A.  Yes.

14  Q.  You were asked about -- I'm on the right shoulder

15  now -- right shoulder pain before the accident.  Do you

16  recall seeing records from as far back as 2006 where

17  Ms. Cahillane complained of right shoulder pain?

18  A.  I believe so, yes.

19          ATTORNEY PIEMONTE:  You could show Dr. Michna Joint

20  Exhibit 7 at MMC-120.  And if you could scroll to the date,

21  please.

22  BY ATTORNEY PIEMONTE:

23  Q.  This is a Mercy Medical Center record dated -- I'm sorry.

24  A.  It's written European.  But it looks like it is

25  February 11th, 2006.

1   Q.  That was my next question.  Is it 2006, February 11th?

2       Okay.  And what was the reason for imaging on that date?

3   A.  Right shoulder pain.

4   Q.  And what were the findings?

5   A.  Showed some calcifications present in "the superolateral

6   margin of the humeral head consistent with tendinous

7   calcifications."

8   Q.  If you could just make sure, too, that you're speaking

9    into the microphone so that everyone can hear.

10  A.  I'm sorry.

11  Q.  No, that's fine.

12      Did those findings cause pain?

13  A.  Yes.

14  Q.  Ask to show you another record, dated August 29th, 2006,

15   Joint Exhibit 7 at MMC-124.

16     What was the reason for the imaging on this date?  And,

17   again, I believe it is May 8 -- August 29th, 2006?

18  A.  Yes.

19  Q.  Okay.  What was the reason?

20  A.  Shoulder pain again.

21  Q.  Okay.  And what --

22  A.  This was an MRI of the shoulder.

23  Q.  And what were the findings -- the Findings and Impression

24   on that date?

25  A.  Oops.  Degenerative changes of the AC -- AC joint "with

1    inferior osteophyte in close approximation to the

2    supraspinatus tendon."

3    Q.  In English?

4    A.  So basically, there's a little joint in the front of the

5    shoulder.  It is called the AC joint.  And there is arthritic

6    changes there.  And there is some irritation in the tendon of

7    one of the shoulder strap muscles.  And there's a partial

8    tear.  Could be a partial tear.

9    Q.  And that's of the right shoulder in 2006?

10   A.  That's correct.

11           ATTORNEY PIEMONTE:  And if you could scroll to page

12   125, please.

13   BY ATTORNEY PIEMONTE:

14   Q.  Again, asking you to review the Impression where it

15    indicates that there was "thickening and abnormal signal...

16    involving" a "tendon" and "a partial tear is considered."

17        Do you see those findings?

18   A.  I do.

19   Q.  And it also notes AC degeneration; is that correct?

20   A.  That's correct.

21   Q.  Can you explain what those findings mean and whether they

22    cause pain?

23   A.  Well, they do cause pain.  And, again, it's the same joint

24   in the front that -- the AC joint -- that's degenerative or

25   arthritic.  And then there's a potential of a tear in one of

1    the muscles that are called -- around -- they're called the

2    rotator cuff muscles.

3    Q.  And that's in 2006, Dr. Michna?

4    A.  That's correct.

5    Q.  I'll ask you -- I'll also ask you about records in 2014.

6              ATTORNEY PIEMONTE:  If you could bring up Joint

7    Exhibit 7, MMC-163.

8    BY ATTORNEY PIEMONTE:

9    Q.  Do you see this imaging report dated January 16th, 2014?

10   A.  Yes.

11   Q.  What was the reason for the imaging on that date?

12   A.  Shoulder pain and decreased range of motion.

13   Q.  Okay.  And going down to the impression, number 1.

14   A.  "Findings suggestive of tendinitis," an inflammation of

15    the tendon.

16   Q.  Does inflammation of the tendon cause pain?

17   A.  Yes.

18   Q.  Moving on to physical therapy, Dr. Michna.  You were asked

19    if you had seen any records concerning physical therapy

20    treatment before the accident in 2020.  Do you recall that?

21   A.  Yes.

22   Q.  I'd ask you to take a look at Joint Exhibit 9 at page 325.

23              ATTORNEY PIEMONTE:  And moving down -- thank

24    you -- stop.  If you could stop right there.  Thank you.

25

1   BY ATTORNEY PIEMONTE:

2   Q.  Moving down to the History of Present Illness, I'd like to

3    ask you for a minute, what is a History of Present Illness?

4   A.  Again, it's a summary of what has been happening in terms

5    of whatever focus you're looking at, in terms of medicine

6    over the last period of time --

7   Q.  The history --

8   A.  -- prior history.

9   Q.  The History of Present Illness, is it the same as the

10   History of Present Illness that you took during your

11   examination of --

12  A.  Yes.

13  Q.  And what was the focus for this particular admission or

14   this particular --

15  A.  Well, she had right shoulder pain and weakness.

16  Q.  And that was in 2014?

17  A.  Yes.

18  Q.  Now, what, if any, surgical interventions did -- do the

19   records indicate Ms. Cahillane had in 2006, if any?

20  A.  I don't -- I don't know.

21  Q.  Referring you to the second sentence of the History of

22   Present Illness.

23  A.  Oh.  "Right shoulder surgery" is above.  Okay.  I'm sorry.

24  Q.  No, that's fine.

25      Now, following that, does your review of the History of

1    Present Illness refresh your recollection whether before 2020

2    Ms. Cahillane had gone to physical therapy for shoulder pain?

3    A.  Yes.

4    Q.  And what is that memory?

5    A.  "She has done physical therapy exercises, which seemed to

6    aggravate her pain."

7    Q.  You were asked a number of questions regarding --

8                ATTORNEY PIEMONTE:  And thank you.  You can take

9    that down.

10   BY ATTORNEY PIEMONTE:

11   Q.  You were asked a number of questions regarding knee pain

12   before the motor vehicle accident.  Do you recall that line

13   of questioning?

14   A.  Yes.

15   Q.  And I think you testified that an MRI indicated

16   that -- and, again, I'm leading just for context here -- that

17   an MRI had indicated that there was degenerative joint

18   disease prior to the accident; is that right?

19   A.  Yes.

20   Q.  Does degenerative joint disease cause pain?

21   A.  Yes.

22   Q.  And I'd like to show you an example of -- a medical record

23   and ask you if you've reviewed it.

24                ATTORNEY PIEMONTE:  It is Joint Exhibit 5 at

25   page 59.

1    BY ATTORNEY PIEMONTE:

2    Q.  This is a medical record dated February 28th, 2022.  Do

3     you see that as the Encounter Date on the top right-hand

4     side?

5    A.  I do.

6    Q.  And what was the Impression on that date?

7    A.  "Arthritis of the left knee.  Left knee injury, sequela."

8    Q.  Okay.  Can arthritis of the left knee cause pain?

9    A.  Yes.

10   Q.  Does a -- strike that.

11          ATTORNEY PIEMONTE:  You can take that down.  Thank

12    you.

13   BY ATTORNEY PIEMONTE:

14   Q.  You testified that Ms. Cahillane walked at times with an

15    antalgic gait and that it was probably related to the pain in

16    her leg.  Do you recall that testimony?

17   A.  Yes.

18   Q.  Do you recall in your review of the medical records the

19    reason for Ms. Cahillane's antalgic gait?

20   A.  What period of time are we talking about?  Post-accident?

21   Q.  Pre- or post-?

22   A.  Well, I'm -- pre-, it was probably due to the arthritic

23    changes in her knees and probably also due to her chronic

24    back pain.

25   Q.  Do you recall anything in the medical records that you

Case 3:22-cv-30156-MGM   Document 75   Filed 06/20/25   Page 157 of 179

Day 4 - Page 157

1  reviewed indicating that Ms. Cahillane suffered from a

2  left -- from a leg length discrepancy?

3  A.  Yes.  There was a description by the orthopedics

4  department -- I don't know the exact dates -- stating that

5  they felt she had a leg length discrepancy.  And that was

6  when, I believe, they were discussing the sacroiliac pain

7  that she suffered from.

8  Q.  And would that also be a reason for pain?

9  A.  Yes.

10  Q.  You also were shown a record of November 16th, 2020 from

11  Trinity Health, where Ms. Cahillane complained that climbing

12  stairs was uncomfortable.  I think it also stated she was

13  single-stepping the stairs and having trouble bearing weight.

14  Do you recall that?

15  A.  I do.

16  Q.  Do you recall the status of the fibula fracture at that

17  point in time?

18  A.  What was the date on that?

19       ATTORNEY PIEMONTE:  Let's pull that up.  It is Joint

20  Exhibit 5 at 42.

21  BY ATTORNEY PIEMONTE:

22  Q.  Looking at this record, are you able to say what the visit

23  date was and --

24  A.  Yes.  It was 11/16/20.

25  Q.  And, again, this is a History of Present Illness.  Can I

1    ask you, Dr. Michna, with histories of present illness, are

2     those medical diagnoses?

3    A.  They can incorporate medical diagnosis.  They might also

4     incorporate what the patient says and what they're reporting.

5    Q.  And same question with regard to subjective complaints.

6     What's a subjective complaint?

7    A.  Subjective is basically what the patient reports to you.

8    Q.  And are subjective complaints medical diagnoses?

9    A.  No.  They're subjective complaints.  We have to take that

10    complaint and, based on the totality of the information, come

11    up with a medical diagnosis.

12   Q.  And referring to History of Present Illness, the second

13    sentence, does that refresh your recollection on the status

14    of the left fibula fracture that she sustained --

15    Ms. Cahillane sustained?

16   A.  Yes.

17   Q.  And what was the status as of November 16th, 2020 of the

18    fracture?

19   A.  It was totally healed.

20            ATTORNEY PIEMONTE:  And if you can scroll down to

21    the Impression and Plan, please.

22   BY ATTORNEY PIEMONTE:

23   Q.  And what was the Impression and Plan on the date of this

24    visit on 11/16/2020?

25   A.  The Impression was "left lower leg/calf pain and swelling.

1    Healed left fibula proximal shaft fracture.  Deconditioning

2    left lower extremity."

3    Q.  And what, if you know, is deconditioning of a left lower

4     extremity?

5    A.  Typically, it means that the -- there's not strong muscle

6     integrity.  And it could be due to a variety of factors:  Not

7     active, non -- you know, wasting of the bone -- of the muscle

8     due to inactivity.

9    Q.  Okay.  And I'm going to go to the next page, Joint

10    Exhibit 5 at 43.  Do you recall being shown this document

11    dated March 8th, 2021, during your cross-examination?

12   A.  I do.

13   Q.  And during your testimony, you asked to see the remainder

14    of the document.  Do you recall that?

15   A.  I did.

16   Q.  What is it that you would like to review off this

17    document?

18   A.  I don't remember, but if we go down further, let's see.

19   Q.  I'm going to -- okay.

20   A.  Oh.  It was the left knee pain, I think, and the meniscal

21    tear.

22   Q.  The Impression being "left knee pain" and "meniscus tear";

23    is that what you said?

24   A.  Right.

25   Q.  Now, were meniscus signs reviewed during this visit on

1   February 28th, 2022?

2   A.  I'm sorry.  I don't --

3   Q.  I'm sorry.  During March 8th, 2021, were meniscus signs

4    reviewed?

5   A.  Well, we can look at her physical exam.  "Meniscus signs

6    are negative other than medial joint line tenderness."

7   Q.  What does "meniscus signs are negative other than medial

8    joint line tenderness" mean?

9   A.  I guess when they pressed on the joint, there was some

10   tenderness but, based on their physical exam, they didn't

11   think there was a tear in the meniscus.

12          ATTORNEY PIEMONTE:  I'm going to ask -- if you could

13   please scroll down.

14  BY ATTORNEY PIEMONTE:

15  Q.  And then under the Plan, did you review this plan in

16   forming your opinion in this case?

17  A.  Yes.

18  Q.  And I'm going to just read from the record:  "Since the

19   X-ray shows what appear to be mild changes consistent with

20   osteoarthritis, there is a possibility that the majority of

21   her medial joint line symptoms are related to the meniscus."

22      Did I read that correctly?

23  A.  That's correct.

24  Q.  What is osteoarthritis?

25  A.  That's degeneration of the joint.

1   Q.  And does degeneration of the joint cause pain?

2   A.  Yes.

3            ATTORNEY PIEMONTE:  You can take that down.  Thank

4   you.

5   BY ATTORNEY PIEMONTE:

6   Q.  You were shown some physical therapy records -- or a

7    physical therapy record from May 19th of 2020, and that is

8    Joint Exhibit 4.  And it was her discharge

9    summary -- Ms. Cahillane's discharge summary.  Do you

10   remember that?

11  A.  Yes.

12  Q.  I'd ask you to take a look at Joint Exhibit 4 at page 116.

13   On the upper -- I'm sorry.  What was the treatment date on

14   this?

15  A.  5/12/20.

16           ATTORNEY PIEMONTE:  Okay.  And I'd ask you to scroll

17   down, please.  If you could stop.

18   BY ATTORNEY PIEMONTE:

19  Q.  What was her pain level on May of 2020?

20  A.  It's reported here as 0 out of 10.  No pain.

21  Q.  And I'm now going to ask you -- to show you a record from

22   May 14th, 2020.

23           ATTORNEY PIEMONTE:  Joint Exhibit 4 at 85, please.

24   Scrolling down to the date noted -- at the very bottom.

25   There we go.

1    BY ATTORNEY PIEMONTE:

2    Q.  Do you see May 14th, 2020?

3    A.  Yes.

4    Q.  It appears that Ms. Cahillane had canceled her physical

5     therapy appointment on that day?

6    A.  That's correct.

7    Q.  Do you have any experience with regard to physical therapy

8     and its effects on pain?

9    A.  It is one of the first things we do because it has

10    probably a lot better efficacy than most things we can do for

11    patients suffering from these kind of joint and back

12    problems.

13    Q.  In your opinion, when you're treating patients who

14     you've --

15            ATTORNEY PIEMONTE:  You can take that down.  Thank

16    you.

17    BY ATTORNEY PIEMONTE:

18    Q.  -- referred to physical therapy for pain management, do

19     you have an opinion, one way or the other, about whether it

20     is important to be consistent with your physical therapy

21     appointments?

22            ATTORNEY MANGINI:  Objection.

23            THE COURT:  Overruled.

24            ATTORNEY MANGINI:  Your Honor, I just note that it

25     is outside the scope of his report.

1        ATTORNEY PIEMONTE:  But it is within the scope of

2    cross.

3        THE COURT:  I agree.  Overruled.

4    A.  Yes.  Physical therapy is very important and it's very

5    important to be consistent in attending the sessions.

6    Everything we do is a multipronged approach.  And physical

7    therapy is certainly -- along with injections and other

8    modalities -- are very important.

9    BY ATTORNEY PIEMONTE:

10   Q.  And you were shown a number of other documents on your

11   cross-examination with regard to Ms. Cahillane's pain -- her

12   left knee pain, her low back pain, her lower leg pain, neck

13   pain, left shoulder pain, left hip pain, and her

14   chronic -- complaints of chronic pain.

15       Do any of the documents that you were shown during your

16   cross-examination change your opinion in this case?

17   A.  No.

18       ATTORNEY PIEMONTE:  Thank you.  I have nothing

19   further.

20                       RECROSS-EXAMINATION

21   BY ATTORNEY MANGINI:

22   Q.  Good afternoon.  I want to go back to something you were

23   just asked about when you talked about history of present

24   illness and subjective complaints.  And I just want to

25   confirm that is something that doctors rely on when making

1    the medical diagnoses, correct, among other things?

2    A.  It is part of it, yes.

3    Q.  It's a factor?

4    A.  Yes, absolutely.

5    Q.  And really that comes down to the credibility of the

6    patient, whether or not the doctor believes that a patient is

7    telling the truth or exaggerating or lying, correct?

8    A.  Well, you accept what the patient is telling.  It's up to

9    you to determine whether it's lying versus psychiatric versus

10   a combination of organic and psych, or is it totally organic?

11   So it is just part of our decision-making process.

12   Q.  And you were just asked some questions about physical

13   therapy and its importance.  And as you sit here today, do

14   you know how much PT Margaret Cahillane attended or did not

15   attend?

16   A.  The exact dates, no.

17   Q.  And are patients diagnosed from physical therapy with what

18   is called a home exercise program?

19   A.  I'm sorry?

20   Q.  Are patients sometimes discharged from physical therapy

21   with a home exercise program?

22   A.  Well, after a certain point.  If they're -- for a

23   multitude of reasons -- they're not making any further

24   progress and the maximum medical benefit; or there could be

25   insurance restrictions on further care.  So, typically, you

1  know, we'll encourage the patients to continue the exercise

2  program at home.  And that's an important factor also.

3  Q.  And as you sit here today, do you know if Margaret

4  continued to do the home exercises at home as directed?

5  A.  I don't know specifically, no.

6  Q.  You were just shown -- I believe it was the note from the

7  Orthopedic Care Center regarding Dr. Rhodes, where he didn't

8  find any signs of a medial -- or the signs for the medial

9  meniscus tear were negative, correct?  Or suggested that they

10  were negative?

11  A.  If you pull it back up, I can --

12  Q.  We can come back to that in a second.

13  A.  Okay.

14  Q.  You were asked a lot of questions on redirect about

15  whether or not arthritis can cause pain.  And I think we all

16  agree that arthritis can cause someone to experience pain or

17  an increase in symptoms, correct?

18  A.  Yeah.

19  Q.  But in this case specifically, there's nothing suggesting

20  that there was pain in the five years before the accident due

21  to Margaret Cahillane's arthritis, other than that November

22  2019 visit, correct?

23  A.  I mean, it's -- I mean, there were several X-rays that

24  were ordered because of pain.

25  Q.  Right.  One was in 2005.

1  A.  Okay.

2  Q.  And one was in 2011.

3  A.  Okay.

4  Q.  You were not shown any records after that 2011 X-ray to

5   suggest she was in pain, correct?

6  A.  Again, I don't know specifically of any.  All I know is

7   there were.

8  Q.  And on redirect, you were not shown any medical records

9   post the 2012 physical therapy visit to suggest Margaret

10   Cahillane was actively treating for low back or lumbar pain

11   prior to the motor vehicle collision, correct?

12  A.  I'm -- again, I don't know -- I don't have any independent

13   memory.  But from what you showed me, that's correct, yes.

14  Q.  And other than that 2011 cervical X-ray and then the

15   November 4th, 2019 visit that we talked about, when I asked

16   you questions the first time, you haven't seen any -- or you

17   weren't shown any other records to suggest that she was

18   actively treating for neck pain during that period of time,

19   correct?

20  A.  Well, today I was shown what I was shown, yes.

21  Q.  You were asked some questions about Margaret's -- or about

22   right shoulder injuries and whether or not arthritis can

23   cause pain in the right shoulder.  My question for you,

24   though, is if someone has pain in their right -- arthritis in

25   their right shoulder, can repetitive motions or overuse of

1  that shoulder cause an aggravation or exacerbation of the

2  underlying arthritis?

3  A.  I would defer to my orthopedic colleagues to answer that

4  question.

5  Q.  And, in fact, you actually have no opinion regarding

6  Margaret's right shoulder in your report, correct?

7  A.  I'm sorry?

8  Q.  You did not author an opinion regarding Margaret

9  Cahillane's right shoulder?

10  A.  The only thing I reported is that she had the surgery

11  prior to my exam.

12  Q.  And you mentioned that you saw records from 2016 where

13  Margaret Cahillane was prescribed Vicodin for her low back

14  pain.  Do you know what records those were that you were

15  referring to?

16  A.  I mean, it was just -- it was primary care records, I

17  believe.

18  Q.  And it was -- specifically said for low back pain?

19  A.  I think that would be the assumption I would make -- made

20  based on the record.

21  Q.  So it is an assumption, but you don't know if it actually

22  said that in the records?

23  A.  I don't remember specifically.

24  Q.  Margaret Cahillane actually had a lateral meniscus tear,

25  not a medial meniscus tear, correct?

1  A.  I'm sorry?

2  Q.  She had a lateral meniscus tear as opposed to a medial

3   meniscus tear?

4  A.  She had a medial on the last MRI, I believe.

5  Q.  Lateral, correct?

6  A.  No.  I thought it was medial.  If we can get that report.

7   That was the most recent.

8  Q.  While she's looking for that --

9  A.  Sure, no problem.

10  Q.  -- we'll just kind of keep going because I don't want to

11   lose a lot more time.

12  A.  No problem.

13  Q.  You talked about how Margaret has chronic back pain.  But

14   in this case, we're talking about an X-ray in 2005, an X-ray

15   in 2010 -- I'm sorry -- one visit in 2010, an X-ray in 2011,

16   and a PT visit in 2012.  That's considered chronic?

17  A.  Well, it is chronic in the fact that it has been around

18   for many, many years.  So the fact that she had it -- you

19   know, as I alluded to before, problems become cyclical,

20   especially back problems.  So usually we note when the

21   problem started.  So, certainly, somebody that has had back

22   pain for over 15, 20 years would be a "chronic back pain"

23   patient.

24  Q.  Even though she's not consistently complaining of pain or

25   getting treatment?

1    A.  As I said, the normal course of back pain is very

2     episodic.  You know, it would be symptomatic, and then you're

3     asymptomatic; and symptomatic, asymptomatic.

4    Q.  So even though she had this chronic back pain, you would

5     agree with me that it appears -- at least from the records

6     that you've seen -- that it was asymptomatic from 2012 until

7     the car collision?

8    A.  I don't know if it was or not.  We'd have to ask the

9     patient.  But from the records, those documentations were

10    made at that date.

11    Q.  I just want to show you one more record.

12              ATTORNEY MANGINI:  Can you pull up Joint Exhibit 5,

13    page 43.

14    BY ATTORNEY MANGINI:

15    Q.  And I think you were just shown this record on redirect.

16     And this is the Orthopedic Care Center record --

17    A.  Yes.

18    Q.  -- from March 8th, 2021.

19    A.  Yes.

20    Q.  And it says under Imaging Studies:  "X-rays had been done

21     in April of 2020," which is after the motor vehicle

22     collision, correct?

23    A.  Yes.

24    Q.  And that that X-ray only showed minimal osteoarthritis,

25     correct?

1  A.  There were tibial spines that were present.  So there's

2  arthritis.  But other than that, there was minimal

3  osteoarthritis.  So there was some degenerative changes.

4  Q.  And, again, that left knee MRI that you talked about --

5  A.  Yeah.

6  Q.  -- I just want to make sure -- you don't know if that was

7   an MRI that you saw post-accident or preaccident, correct?

8  A.  The one I was -- I thought it was preaccident, yeah.

9  Q.  Do you know when that left knee MRI was?

10  A.  I don't remember.  Unless it's in my report here.

11  Q.  I don't think there's a date in your report.

12  A.  Okay.  Yeah.  I'm sorry.

13  Q.  In any case, though, the MRI that defense just showed you

14   was from 2022, post-accident, correct?

15  A.  I believe so, yeah.

16          ATTORNEY MANGINI:  Those are all of the questions I

17  have, your Honor.

18          THE COURT:  Okay.  Thank you.

19          ATTORNEY PIEMONTE:  Just one, your Honor.

20                  FURTHER REDIRECT EXAMINATION

21   BY ATTORNEY PIEMONTE:

22  Q.  Dr. Michna, I'd like to show you Joint Exhibit 9 at

23   page 442.  And I'll ask you to look -- if you go back just

24   one page, to put it in context for you, do you see this as

25   a -- November 24th, 2016 record at Mercy Medical Center?  Do

1    you see that?

2    A.  Yes.

3    Q.  And now I'm going to refer you down to the Medications on

4    Discharge.  Do you see that?

5    A.  Yes.

6    Q.  Now going to page 442, I'd ask you to take a look at

7    number 11 and ask you whether it refreshes your recollection

8    that Ms. Cahillane was prescribed Vicodin for back pain prior

9    to the motor vehicle accident?

10   A.  It says, "Vicodin one tablet at bedtime for severe pain

11   related to prior breast reconstructive surgery and back

12   pain."  So it was a dual use.

13          ATTORNEY PIEMONTE:  Thank you.  Nothing further.

14          THE COURT:  Any else?

15          ATTORNEY MANGINI:  Just follow up on that specific

16   question.

17                 FURTHER RECROSS-EXAMINATION

18   BY ATTORNEY MANGINI:

19   Q.  Dr. Michna -- Michna, sorry -- that record that you just

20   showed, that was the Mercy Medical Center E.R. records, where

21   Ms. Cahillane was complaining of nausea and vomiting and the

22   flu, correct?

23   A.  I don't know exactly --

24          ATTORNEY MANGINI:  Can you pull up Joint Exhibit 9,

25   page 442, please.  Can you scroll up to page 441.

1    BY ATTORNEY MANGINI:

2    Q.  So Date of Discharge 11/28/16.  And the Final Discharge

3    was for "acute kidney injury, hypokalemia, nausea, and

4    vomiting and diarrhea," correct?

5    A.  That's what it says.

6                ATTORNEY MANGINI:  Thank you.  No further questions.

7                THE COURT:  All right.  All set?

8                     FURTHER REDIRECT EXAMINATION

9    BY ATTORNEY PIEMONTE:

10   Q.  Dr. Michna, are you aware of a Vicodin prescription for

11   pain due to nausea, vomita -- and vomiting?

12   A.  No.  You would not give pain medicine for that.

13               ATTORNEY PIEMONTE:  Thank you.

14               THE COURT:  Thank you.  We're all set.  Thank you

15   very much.

16               THE WITNESS:  Okay.

17               (Discussion off the record.)

18               THE COURT:  All right.  So tell me what we should

19   expect for Friday.

20               ATTORNEY MORGAN:  We expect to just have one

21   witness, your Honor.  Another expert for the Government, an

22   orthopedist.

23               THE COURT:  So about the same length of testimony?

24               ATTORNEY MORGAN:  Hopefully we'll be a little

25   quicker, but, yes, I'd plan --

1          THE COURT:  Same range?

2          ATTORNEY MORGAN:  It's one expert.  So that's one

3    expert like today.  And that will be probably the

4    Government's last witness.

5          THE COURT:  All right.  And then you were given a

6    date to come back for closings, correct?

7          ATTORNEY MORGAN:  Yes.  A week from today; I believe

8    at 10:00 a.m.

9          THE COURT:  And we talked about this before -- I'll

10   ask both parties to respond to the same question.  So it is

11   your preference to submit -- and that's absolutely fine.  You

12   want to submit proposed findings, and you want to submit

13   something in writing before the closing or after?

14         ATTORNEY MORGAN:  I don't think the Government would

15   be able to prepare its filing before the closing, your Honor.

16   I know in previous cases we have.  They may have been

17   slightly more complicated, but we have submitted findings of

18   facts, conclusions of law, a few months -- I believe last

19   time it was 90 days that we had to submit those.

20         THE COURT:  Yes, you are right.

21         ATTORNEY MORGAN:  That is certainly the Government's

22   preference to have those.  We would also be, I think, fine

23   submitting those and then having argument after instead of

24   doing closings next week.  But I defer to the Court on that.

25         THE COURT:  Okay.  I mean, I'm interested to know

1    what you would prefer to do as well.  That would be your

2    preference, to do the closing after you submit?

3            ATTORNEY MORGAN:  I think it would, your Honor.  I

4    think it would provide the Court with the full context of the

5    parties' views and become more of kind of the argument on the

6    substance as opposed to kind of the standard closing

7    argument -- which I guess I defer to the Court as to whether

8    the Court would find that more helpful than a standard

9    closing argument and then a brief submitted after.

10           THE COURT:  What would be your preference?

11           ATTORNEY MANGINI:  Your Honor, the plaintiff's

12   preference would be to submit the findings of facts and do

13   the closing next Wednesday.  I think the case that my brother

14   just referenced, if it's the case I am thinking of, is a much

15   more complicated case than, I would suggest, this case is.

16   And this is a fairly straightforward motor vehicle collision.

17           THE COURT:  No, you're right, it was.  But I'm not

18   going to hold you to -- that's too short of a time to prepare

19   proposed findings and then --

20           Because you gave them what?  The June 11th?

21           THE CLERK:  Yes.

22           THE COURT:  Yeah.  That would be too short of a

23   time.  So if you want to file something, let's talk about an

24   agreed date for everybody, to let you file first and then do

25   the closings.

1          And as a follow up, let me ask you:  Have the

2     parties continued your discussions in this case?

3          ATTORNEY MORGAN:  No, your Honor.  We haven't had

4     any discussions essentially.  Well, we had the mediation,

5     your Honor.  We have talked a little bit since then.  But we

6     have not -- we have not talked since the start of trial, no.

7          THE COURT:  All right.  Well, I mean, the trial has,

8     I would suggest -- I'm not sure for you, but at least as I

9     view this -- perhaps the trial has been helpful on the issue

10    of negligence, although I'm quite sure the Government didn't

11    think negligence was the greatest argument for you in this

12    case.  I appreciate that you made the argument.  And as you

13    usually do, you made a very good argument with what you had,

14    but...

15         So that being said, the Court has been very

16    transparent as to what I view as negligence in this case.

17    But I also said -- and this continues to be an issue -- the

18    Government is getting some traction on the damages.  So that

19    seems to me like a door being opened to continue discussing

20    the case.

21         All right.  So let's get a date for -- we'll see you

22    on Friday.

23         But, Christina, let's push the closing arguments

24    back a little bit, to give a little more breathing room to

25    file something before the closings.

1          (Discussion off the record.)

2          THE COURT:  Would that be enough time?  Closings on

3    the end of June, June 23rd, and file something by the end of

4    18th?

5          ATTORNEY MANGINI:  Plaintiff can certainly file

6    something by the 18th.

7          THE COURT:  I mean, if you want to, I'm fine going

8    into July.  You know, we, obviously, want to pass over the

9    Fourth of July time.  But I'm fine.

10          ATTORNEY MORGAN:  Your Honor, I think, from the

11    Government's perspective, because of the way the trial has

12    been fragmented, just the way it worked out, you know,

13    there's been other matters both AUSA Piemonte and I have had

14    to push off, and it has kind of disrupted our schedules.

15    Having another only two weeks to put together the findings of

16    fact and conclusions of law and then have an argument is, I

17    think, still rather short.

18          I would ask for at least 30 days for that.  I really

19    prefer longer, but I recognize that maybe that's not tenable.

20          THE COURT:  Okay.  I'll give you a little more time.

21    But I'm not going to go too far out.  It's just not that long

22    of a or complicated of a case.

23          ATTORNEY MORGAN:  I think -- from the Government's

24    perspective, I think the negligence piece is really

25    straightforward.  We've heard what the Court has said.  The

```
 1    medical records are, obviously, voluminous and, I think,

 2    potentially complicated.  And that's part of my hesitance

 3    about the shorter time frame.

 4              THE COURT:  Fair point.

 5              THE CLERK:  So file by July 7, and we'll have

 6    closings July 14.

 7              ATTORNEY MORGAN:  That's fine for the Government.

 8              ATTORNEY MANGINI:  That can work for the plaintiff

 9    as well, your Honor.

10              THE COURT:  That will work.

11              ATTORNEY MORGAN:  I apologize.  Is it possible to do

12    another day that week?  If not, we can stick with the 14th.

13    Another day would be slightly better for closings.

14              THE CLERK:  We can do the afternoon of July 17.

15              ATTORNEY MORGAN:  That's fine for the Government.

16              THE CLERK:  It will be 1:30.

17              ATTORNEY MANGINI:  1:30?

18              THE CLERK:  Yeah, July 17, 1:30.

19              ATTORNEY MANGINI:  So July 7th, findings of fact,

20    and then the 17th is -- okay.

21              THE CLERK:  Mm-hmm.

22              THE COURT:  All right.  Very good.  Thank you.  So

23    we'll see everyone Friday.

24              ATTORNEY MORGAN:  Thank you, your Honor.

25              ATTORNEY MANGINI:  Thank you, your Honor.
```

1          (Whereupon, the proceedings adjourned at 3:02 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4            I, Leigh B. Gershowitz, Registered Merit

5    Reporter and Certified Realtime Reporter, in and for the

6    United States District Court for the District of

7    Massachusetts, do hereby certify that the foregoing

8    transcript is a true and correct transcript of the

9    stenographically reported proceedings held in the

10   above-entitled matter, to the best of my skill and ability.

11

12

13   /s/ Leigh B. Gershowitz                June 20, 2025
     Leigh B. Gershowitz, RMR, CRR                Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25